**OLSON PLUMBING & HEATING CO.**

v.

**The UNITED STATES.**

**No. 496–77.**

United States Court of Claims.

July 18, 1979.

Richard M. Preston, Washington, D. C., for plaintiff; John S. Pachter, Washington, D. C., attorney of record. vom Baur, Coburn, Simmons & Turtle, Washington, D. C., of counsel.

Sandra P. Spooner, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and SMITH, Judge.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SMITH, Judge.

This is a contract case in which, by cross-motions for summary judgment, the court is asked to review a decision of the Armed Services Board of Contract Appeals (the board)[1] in accordance with the standard of review of the Wunderlich Act. 41 U.S.C. §§ 321, 322 (1976). The question for decision is whether the board's determination, that the Government did not waive its right to terminate the production and design contract with plaintiff, is supported by substantial evidence and is correct as a matter of law. We hold that the contract was properly terminated and affirm the decision of the board.

### I.

On October 21, 1970, plaintiff, Olson Plumbing & Heating Company (Olson), was awarded contract No. FO–5611–71–C–0025, a Small Business Set-Aside, for the installation of a high temperature hot water line

---

1. *Olson Plumbing & Heating Co.,* 75–1 BCA ¶ 11,203, ASBCA Nos. 17965, 18411.

encased in fiberglass reinforced plastic (FRP) at the United States Air Force Academy (Academy) near Colorado Springs, Colorado.[2] Since the FRP conduit was a relatively new product and there were no regulations governing its use, the design specifications inserted into the contract by the Government were drawn from the design specifications of Ric-Wil, an experienced manufacturer of FRP conduit.[3] These specifications were incomplete. The omitted design details had to be provided by the supplier of FRP conduit chosen by the contractor. In its letter confirming its bid, plaintiff informed defendant that it was going to use conduit supplied by the E. B. Kaiser Company (EBKO).[4]

Initially, plaintiff had until June 20, 1971, 202 days after the notice to proceed was issued, to finish the line. It worked on the above-ground portion of the line while waiting for the first delivery of pipe. After receiving the first shipment of FRP conduit on March 1, 1971, plaintiff installed, backfilled, and successfully pressure-tested the portion of the line beneath the parking lot. Subsequent deliveries of pipe were discovered to have been damages during shipping and air pressure leaks were discovered in the installed portion of the line which had been laid with the first shipment of conduit.

On April 26 and 27, 1971, representatives of Olson, the Academy, and EBKO met and discussed the problems. The recommendation of the EBKO representative to patch and repair some of the pipe in the field under the supervision of a factory representative and to reject 18 sections of conduit was adopted. The representative of the manufacturer of the pipe, Wolf Ridge Plastics, Inc., concurred with this recommendation, and both plaintiff and the Government relied on this advice. This was not the end of plaintiff's troubles. The anchors designed by EBKO were defective and had to be redesigned. Olson had to replace two anchors located beneath the parking lot.

On July 6, 1971, the replacement conduit arrived at the site and was discovered to have also been damaged during shipment. It was rejected and returned to the manufacturer. In August 1971, the parties agreed to extend the completion date for 77 days or until September 8, 1971.[5] Olson did not complete the contract by the due date, but defendant did not terminate the contract for default. Instead, on the delivery date, September 8, 1971, it sent plaintiff two letters stating that it was not waiving its rights by permitting plaintiff to continue performance and that liquidated damages would be assessed at the rate of $105 per day as stipulated in the contract, from September 8, 1971, until the date of completion. Another due date was not set.

On September 23, 1971, plaintiff received the same 18 sections of pipe which it had previously rejected and returned. Attempts to repair these sections had been made at the factory, but they were only partially successful. EBKO's advice to repair and use the casings which had been rejected in April was agreed to by the parties. These repairs were successful. After

2. The Air Force Academy had heard that FRP conduit was less likely to be corroded by the elements than was steel conduit. The DOD's regulation requiring high temperature hot water lines to be encased in steel was waived.

3. The Government-supplied specifications which are pertinent to the decision in this case follow: The minimum wall thickness of the FRP casing containing two 4-inch pipes had to be at least 0.220 inches. The filament had to be wound at an angle of 53° to 55°. The two interior pipes had to be supported in the FRP conduit by full-round pipe supports located not more than 10 feet apart. The supplier of the FRP conduit had to have at least 5 years' experience fabricating and supplying FRP conduit

systems and had to guarantee the conduit for 10 years from the date of backfill. The system had to be able to pass an air pressure test of 15 p. s. i.

4. During the bid preparation period, plaintiff received bids from two manufacturers of FRP pipe, EBKO and Ric-Wil. EBKO's price was $30,000 lower than Ric-Wil's. Plaintiff's bid was $51,750 lower than the next lowest bid.

5. The 77-day extension represented the period between April 19, 1971, the date the damage to the pipe was first discovered, until July 5, 1971, when the defective replacement pipe was delivered.

backfilling and pressure-testing, new leaks developed at the top of the casings and above the pipe supports. On January 12, 1972, the carrier pipe was connected and used until the reprocurement contractor had to disconnect the line.

On January 11, 1972, the parties met and agreed to test some remedies for the leaks above the pipe supports.[6] The tests were conducted between April 24 and May 5, 1972. After the testing was completed, plaintiff refused to implement any suggested repairs unless the Government or the manufacturer would guarantee the results. Plaintiff did not propose a solution. During the summer of 1972, the line was further damaged by exposure and was torn apart in four places by a summer flood.

In a letter dated June 19, 1972, plaintiff stated that the specifications were impossible of performance without changes and that a claim for expenses would be filed. On August 4, 1972, defendant replied with a letter to Olson to show cause, listing deficiencies in the line and inviting Olson to supply reasons why the contract should not be terminated for default. Plaintiff's attorney responded with a request that the contract be terminated for convenience or converted to a cost-plus contract. This request was rejected at a meeting held on August 23, 1972.

At the final meeting held on September 15, 1972, the Government suggested as a solution that the spacing for the pipe supports be revised and that the existing pipe be replaced with FRP conduit which was at least 0.300-inch thick.[7] Plaintiff interpreted the Government's recommendation as a directive. Instead of suggesting an alternative method of repair, on October 3, 1972, plaintiff's attorney informed the Government that its request that Olson replace the conduit and/or respace the pipe supports was beyond the scope of the contract and

that Olson would not resume performance. The Government terminated the contract for default on October 17, 1972. The reprocuring contract officer requested bids for both repairing and replacement of the existing system. The bid for repair was higher than the bids for replacement. The reprocurement contract was awarded to the lowest bidder. The reprocurement contractor timely completed replacement of the underground system using Ric-Wil conduit and the Government's specifications which were, in all material respects, similar to those in plaintiff's contract.

On appeal to the ASBCA from the contracting officer's decision to terminate the contract, the board found that the Government was within its rights when it terminated plaintiff for default because plaintiff had abandoned the contract and the Government had not waived the due date. The board found that there had been a tacit agreement between the parties that work would be held in abeyance from January 12, 1972, until the joint testing project could be completed and that plaintiff should be given credit for the 10 days it should have taken to repair the damage caused by a summer flood. Accordingly, it reduced the 733 days of liquidated damages assessed against Olson to 514 days. It noted that the Comptroller General might find this to be an appropriate case for remission of some of the liquidated damages, suggesting as reasons that the default was attributable to plaintiff's supplier, large sums of liquidated damages are heavy burdens for small business contractors, and the FRP conduit was a relatively new product. The Office of the Comptroller General reduced the liquidated damages to $17,135, representing the period between March 26, 1973, and September 5, 1973, when the reprocurement contractor had to disconnect the line in

6. The parties agreed to stop work on the line until the field tests could be completed. During the testing project, the parties tried to stop the conduit from cracking by placing 1- and 2-inch caps over the pipe, field wrapping one-half way around, and backfilling with different methods and materials.

7. On the agenda for this meeting, the following was noted:

"Failure to reach agreement or obtain correction of deficiencies within ten days will make it necessary to terminate the contract for default."

order to replace the system. This appeal followed.

## II.

Plaintiff contends that the board's decision that the Government was within its rights when it terminated the contract for plaintiff's failure to perform by the due date is erroneous because it incorrectly analyzed the facts under the waiver-by-estoppel doctrine instead of the election doctrine.[8] Plaintiff's theory of recovery is that the Government "elected" between two inconsistent choices. Thus, plaintiff argues, the Government lost its right to terminate the contract for default until a new delivery date had been set because it permitted 13 months to pass after the due date and before it terminated the contract, encouraged plaintiff to continue to perform, and did not set a new delivery date. Under whatever theory the facts are considered, the question of whether the default termination is proper depends upon the facts and circumstances of each case.[9]

Instead of terminating plaintiff for default for failure to deliver a conforming system on the delivery date, defendant sent plaintiff two letters stating that it was not waiving any rights under the contract and that liquidated damages would be assessed against plaintiff until the project was completed.

Where the right to terminate has been expressly reserved or when liquidated damages have been imposed by the non-breaching party, the other party has a heavier burden of proving that the right to terminate for failure to deliver on time has been waived.[10] The reason for this policy, acknowledged in *Acme, supra* note 10, is applicable here though it supports a contrary result. "[T]he defendant cannot allow an *unwary* contractor to continue performance and thus incur *large expenses,* all of which the Government will refuse to reimburse if and when it decides to cancel the contract on the ground of the violation."[11] (Emphasis added.) Plaintiff was neither unwary nor did.it incur large performance expenses. Plaintiff knew that it was in breach for failure to meet the due date. The Government's express reservation of its rights and the assessment of liquidated damages surely made clear to plaintiff that the Government was not excusing the breach. Liquidated damages compensate the non-breaching party for the harm caused by the delayed performance and are a cost of being in breach. *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947). Their imposition is evidence of the intent to hold the defaulting party liable for its delayed performance.

After January 11, 1972, plaintiff never resumed performance under the contract with the exception of minor housekeeping activities and the joint testing project which ended on May 5, 1972. In *Acme,* the court held it would be unfair to permit the contractor to continue incurring *performance costs* for which the Government would not make reimbursement. Housekeeping costs which merely attempt to preserve the status quo and are unrelated to continued performance, and which are not caused by

---

8. Plaintiff cites, for its controlling authorities, *DeVito v. United States,* 413 F.2d 1147, 188 Ct.Cl. 979 (1969), and *International Tel. & Tel. Corp. v. United States,* 509 F.2d 541, 206 Ct.Cl. 37 (1975).

9. *DeVito v. United States, supra* note 8, 413 F.2d at 1154, 188 Ct.Cl. at 991; *see also Cities Serv. Helex, Inc. v. United States,* 543 F.2d 1306, 1314, 211 Ct.Cl. 222, 236 (1976).

10. In *Acme Process Equip. Co. v. United States,* 347 F.2d 509, 171 Ct.Cl. 324 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), the Government

was held to have lost its right to terminate the contract for a breach which it did not expressly reserve and did not assert for over a year after it learned of its existence. In *Northern Helex Co. v. United States,* 455 F.2d 546, 552, 197 Ct.Cl. 118, 128–30 (1972), the court held, as an alternative ground for decision, that the contractor who had made an express reservation of its rights could continue its performance under the unusual circumstances of that case.

11. *Acme Process Equip. Co. v. United States, supra* note 10, 347 F.2d at 515–16, 171 Ct.Cl. at 336.

the Government's fault or by a condition excusing the delay, are properly placed on plaintiff. In order to have the costs, incurred after the passage of the due date, considered as a factor weighing in favor of a finding of a waiver, it must be shown that the expenses contributed to performance.

In *Ling-Temco-Vought, Inc. v. United States,* 475 F.2d 630, 201 Ct.Cl. 135 (1973), the non-breaching party's failure to reserve its rights to claim an unsuspected breach was the basis for denying recovery because this omission denied the defaulting party the option of choosing "whether to terminate the contract entirely at that time * * * or to continue at the risk of having to pay greater damages and incurring additional costs." 475 F.2d at 638, 201 Ct.Cl. at 149. Plaintiff, aware of its options, knowingly decided not to terminate the contract and thereby accepted the risk that it would be unable to correct the breach and to recover its costs. The decision, whether a party to a contract loses its right to terminate for default by not ending the contract on the date performance is due but not tendered, depends upon a balancing of:

> * * * the advantages to the injured side of continuing performance (with or without reservation of rights) against the disadvantages to the defaulter, and requiring that due opportunity be given the latter to make use of the options then lawfully available to him. However the legal conclusion be framed, in terms of "waiver" or "election" or "estoppel", that is the core concept. [475 F.2d at 638, 201 Ct.Cl. at 148–49 (footnote omitted).]

Though hindsight has shown that plaintiff's decision not to terminate the contract was the more costly one, the balancing of the opposing considerations present in this case weigh in favor of defendant in the absence of facts indicating that plaintiff was denied the right to make an informed decision to continue or to terminate.

Moreover, the Government cannot be said to have waived the due date or to have elected continued performance if the contractor has abandoned performance.

> The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and *continued performance* by him under the contract, with the Government's knowledge and implied or express consent. [*DeVito v. United States, supra* note 8, 413 F.2d at 1154, 188 Ct.Cl. at 990–91 (emphasis added).]

The period of time in which the non-defaulting party can reserve its right to terminate for untimely delivery and encourage performance is greater when the contractor abandons performance or when the circumstances indicate that the contractor is unlikely to perform within a reasonable time. *DeVito v. United States, supra* note 8, 413 F.2d at 1153–54, 188 Ct.Cl. at 991. In *Panoramic Studios, Inc. v. United States,* 413 F.2d 1156, 1157, 188 Ct.Cl. 1092, 1095 (1969), decided the same day as *DeVito,* the court expressly distinguished the case on its facts from *DeVito,* in part, because the contractor did nothing substantial toward performance for a 9-month period.

Plaintiff did not uphold a duty it had to make progress toward completion of the contract. The contract placed the risk of design failure upon the supplier of the faulty design specifications.[12] The ability of the reprocurement contractor to complete the contract using the Government-supplied specifications proved that the Government's specifications did not cause the system to leak. The fact that plaintiff delegated to its supplier, EBKO, the responsibility of designing the parts of the system which were not specified in the contract does not shift to the Government the risk

---

12. *Sperry Rand Corp. v. United States,* 475 F.2d 1168, 201 Ct.Cl. 169 (1973); *Austin Co. v. United States,* 314 F.2d 518, 161 Ct.Cl. 76, *cert.* denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963).

that the design would be defective.[13] The contractor alone is responsible for the deficiencies of its suppliers and its subcontractors absent a · showing of impossibility. Plaintiff's failure to produce a leak-free system was due to the deficient design of its supplier, EBKO, and of the failure of the FRP to be wrapped at the angle required by the Government specifications.[14] None of these deficiencies are the fault of the Government.

Plaintiff, who alone bore the responsibility for the faulty design and the nonconforming angle of the wrap, had the duty to find an adequate solution. It failed to produce a solution and was unwilling to implement the suggested solutions of others unless the results were guaranteed from May 5, 1972, when the testing was completed, until the contract was terminated on October 17, 1972, a 5-month period. Olson's failure to make progress toward completion during these 5 months is not the substantial performance required to be present for the Government to be viewed as having lost its right to terminate for failure to meet the due date.

Likewise, plaintiff's contention that the decision in *ITT, supra* note 8, 509 F.2d at 547–48, 206 Ct.Cl. at 50, imposed upon the Government the duty to unilaterally or bilaterally set a reasonable time for performance, is without merit. This duty does not arise under the rule of *ITT* until the facts and circumstances show the due date has been waived. Since we have found the delivery date was not waived, we decline to decide whether the *ITT* rule should apply to construction contracts.

For the same reasons that we held plaintiff's failure to make substantial progress preserved defendant's right to terminate for failure to make timely delivery, we must also reject plaintiff's contention that it justifiably refused, under the cardinal change doctrine, to replace the system with pipe with a 0.300-inch or greater thickness and/or to place the pipe supports at less than 10-foot intervals. The failure of the pipe support designs and the failure of the wrap to conform to the specifications were plaintiff's responsibilities which, in turn, imposed upon it the duty of supplying a remedy. The board's finding, that plaintiff's refusal to implement or to propose any solution constituted an abandonment which gave the Government a right to terminate the contract independent of its right to terminate the contract for failure to meet the delivery date, is supported by substantial evidence.[15]

### III.

As an alternative ground for recovery, plaintiff contends that the equivalent of a termination-for-convenience recovery should be apportioned equally between the

---

13. Section TP 1A–05 of the contract specifically placed on Olson the responsibility of providing part of the specifications for the line in shop drawings: "Detailed drawings of systems not completely identifiable by information submitted in the materials schedules shall be submitted to the Contracting Officer within 20 days after the date of Notice to Proceed. * * Approval of such drawings shall not relieve the Contractor of the responsibility for any error which may exist as *the Contractor shall be responsible for the dimensions and design of adequate connections, details, and satisfactory construction of all work.*" 75–1 BCA at 53,319–20 (emphasis added).

14. The contract specified that the angle of the wrap of the fiberglass in the FRP casing must be within the 53° to 55° range. The wrap on the casings used by plaintiff varied between 70° and 75°. The FRP conduit would have been more resistant to longitudinal strain if the

angle of the wrap had conformed to the specifications. Some of the pipe supports were irregularly shaped and were not full round as required by the Government's specifications. EBKO designed the pipe supports to fit snugly inside the casings. Other suppliers left a space between the pipe supports and the casings. The snug fit prevented the casings from deflecting vertically and from bearing the backfill load by circumferential compression and caused casing to sustain the backfill weight by longitudinal bending which, in turn, stressed the sections above the spacers where the cracks developed.

15. *Preuss v. United States,* 412 F.2d 1293, 188 Ct.Cl. 469 (1969); *Stoeckert v. United States,* 391 F.2d 639, 183 Ct.Cl. 152 (1968); *see also Universal Fiberglass Corp. v. United States,* 537 F.2d 393, 210 Ct.Cl. 206 (1976).

parties. Equitable apportionment of losses are sometimes appropriate under the mutual fault doctrine of *Dynalectron Corp.,*[16] and the mutual mistake doctrine of *National Presto.*[17] In *Dynalectron,* the contractor was wrongfully terminated for default, yet it was not permitted to shift all the loss to the Government. In that case the contractor waived the defects in the system by failing to tell the Government it knew that the Government's specifications were impossible of performance. If it had been notified of the defects, the Government might have been able to correct the problems in the specifications to the advantage of both parties. *Dynalectron's* failure to communicate knowledge of the defects and the poor administration of the contract on the part of both parties unnecessarily increased the losses.

 In contrast, in the instant case, the Government did not know that the specifications drafted by EBKO were defective, and there is no finding that the Government's alleged poor contract administration increased the losses. Poor contract administration, standing alone, which does not amount to a breach, does not entitle a party to shift part of the cost of its own breach to the non-breaching party. Plaintiff's bare allegation, that the Government's poor administration of the contract contributed to the failure of the system and entitles it to have its losses split, fails to prove, as required by the decision in *Dynalectron,* that the parties were equally responsible for the delay in discovering the faulty specifications and/or the losses accompanying this delay. Furthermore, plaintiff's request that we find that the Government's alleged poor contract administration contributed to plaintiff's inability to complete the contract assumes there is causal connection between the alleged "fault" on the part of the Government and the losses sustained. This position is contradicted by the board's finding that the failure to perform was solely plaintiff's fault.[18] Since this finding of the board is supported by substantial evidence contained in the administrative record, the court cannot, in the limited scope of review in Wunderlich Act cases, find that the Government's alleged "poor contract administration" hampered plaintiff's ability to perform, limited its options, or increased its costs. *William F. Klingensmith, Inc. v. United States,* 505 F.2d 1257, 1265–66, 205 Ct.Cl. 651, 665 (1974).

 The parties' mistaken belief that EBKO had 5 years' experience working with FRP conduit is not a mutual mistake of fact entitling plaintiff to reformation of the contract.

* * * [A] mutual mistake as to a fact or factor, even a material one, will not support relief if the contract puts the risk of such a mistake on the party asking reformation * * * or normally if the other party, though made aware of the correct facts, would not have agreed at the outset to the change now sought * *.
* * * [*Flippin Materials Co. v. United States,* 312 F.2d 408, 415, 160 Ct.Cl. 357, 368 (1963).]

Neither condition is met in this instance. Plaintiff was responsible under the contract for choosing a supplier with 5 years' experience with FRP conduit, and its failure to choose one with the requisite qualifications is its own fault. Reformation on the grounds that a mutual mistake has been made is warranted only in the unusual circumstance when the terms of the contract do not reflect the intention of the parties at the time of formation; it cannot be used to impose a condition which would not have been acceptable in the first instance. Noth-

**16.** *Dynalectron Corp. v. United States,* 518 F.2d 594, 207 Ct.Cl. 349 (1975).

**17.** *National Presto Indus., Inc. v. United States,* 338 F.2d 99, 167 Ct.Cl. 749 (1964), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965).

**18.** " * * * We have found that the failure of the casings was due basically to damage in transit, improper design and fabrication of the pipe supports, and the failure of the angle wrap of the fiberglas [*sic* ] to comply with the specifications. All of these, under the Default-Damages article, are attributable to the appellant rather than the Government. * * * " 75–1 BCA at 53,339.

ing in the contract or in the course of dealings between the parties indicates that the Government would have waived the 5-year experience requirement had it known plaintiff planned to use a supplier without the necessary experience. The Government's unfamiliarity with FRP conduit and its placement of this requirement in the contract indicated it considered it important to avoid the mistakes which were more likely to be made by an inexperienced contractor than by one which had successfully performed for 5 years. The subsequent waiver of this requirement does not indicate that the Government would have dropped this requirement from the contract at the time of formation.

Plaintiff's position that the liquidated damages should be reduced because the Government caused much of the delay is without merit. Both the board and the Comptroller General reduced the original amount of liquidated damages assessed against plaintiff. These reduced damages represent the amount assessed for the period of time the line was disconnected by the reprocurement contractor. The Government cannot be said to have caused this delay.

### IV.

Plaintiff, who delegated the design responsibilities allocated to it under the contract, bore the risk that its supplier's specifications would not be sufficient. The only fault, if any, of the Government in the entire course of dealings is its failure to perceive at an earlier date that plaintiff would be unable to cure the defects in the system. With the exception of the duty to mitigate damages, which is not applicable here, there is no equitable or legal remedy available for the failure of one party to believe the other party from the consequences of its own breach.

Plaintiff's motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted; and the petition is dismissed.