**INDEMNITY INSURANCE CO. OF NORTH AMERICA**

v.

**The UNITED STATES.**

Nos. 122–85C, 343–85C.

United States Claims Court.

Jan. 28, 1988.

Gregory E. Ronan, New York City, attorney of record for plaintiff. Ray Goddard and Max E. Greenberg, Cantor & Reiss, New York City, of counsel.

Stephen J. McHale, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

MEROW, Judge:

In these consolidated cases, plaintiff has filed a motion for summary judgment requesting that the October 12, 1984 termination for default by the government of its construction agreement be converted to a termination for the government's convenience. The plaintiff bases its motion on the following facts. The original completion date passed without government termination of the contract and plaintiff continued to perform work which the government had knowledge of and encouraged. The government did not establish a new completion date prior to the default termination. Defendant has crossed moved for partial summary judgment in its favor. The parties agree there are no material facts in issue. For the reasons set forth below in the body of this opinion, defendant's motion is granted; plaintiff's motion is denied.

### Facts

On September 29, 1982, the U.S. Army Communications and Electronics Command, Ft. Monmouth, New Jersey, awarded Arctic Corner, Inc. (Arctic) a contract for the rehabilitation of the Barker Circle Barracks at Ft. Monmouth, New Jersey. The plaintiff is a surety company which issued performance and payment bonds to Arctic as principal.[1] The original contract completion date was March 1, 1984. However, since Arctic had completed only 50 percent of the contract work by the beginning of February 1984, the contract with Arctic was terminated for default (lack of progress) on February 7,

---

1. *See Morrison Assurance Co. v. United States,* 3 Cl.Ct. 626, 632–33 (1983), for discussion regarding the distinction between a performance and payment bond obligation. A performance bond obligates the surety to assume primary responsibility for completion of the contract if the original contractor is unable to complete it. Under applicable regulations, the surety may complete the project itself or, alternatively, allow the government to find a new contractor and pay the government the costs of completion. Thus, the performance bond protects the government by making sure that it is not left with a partially completed project because the original contractor is unable to complete the work. A payment bond, however, protects the subcontractors, laborers, and the materialmen. If the primary contractor fails to pay any of them, the surety is obligated to do so.

1984. A Takeover Agreement was executed between the government and the plaintiff, effective March 8, 1984, pursuant to which the plaintiff agreed to perform all of the uncompleted work under the contract.[2] The Agreement provided for progress payments and contained a work completion date of July 1, 1984. The Agreement also provided that liquidated damages "will be assessed at the rate of $200 per calendar day until the work required by the contract is completed by the Surety," commencing on March 2, 1984. On June 22, 1984, the contracting officer sent a cure notice to plaintiff stating that lack of progress endangered timely completion of the contract. Later, the completion date was extended to July 20, 1984, by contract modification. The plaintiff responded to the notice on July 3, 1984, claiming excusable delays. The government requested more specifics and on July 13 the plaintiff listed a number of government-caused delays. By letter of July 27, the contracting officer rejected each claim of excusable delay and requested the plaintiff to show cause why the Takeover Agreement should not be terminated for default. The plaintiff responded on August 10 and 16, 1984, again stating the government had caused the delays and that it had committed in excess of $400,000 toward contract completion. A meeting was held between the contracting officer and representatives of the plaintiff to determine if default could be avoided. By letter of September 7, the contracting officer notified plaintiff the government would only forbear termination until October 1, 1984, if plaintiff secured a new prime contractor. In addition, the plaintiff was told that acceptance of any work would be for the purpose of mitigating damages and that liquidated damages would continue to accrue. The plaintiff agreed to seek bids for a new contractor. However, work on the project basically stopped after September 22. Subsequently, on October 12, 1984, the contracting officer terminated the Takeover Agreement for default because of plaintiff's lack of significant progress, including

the fact that no new prime contractor had been secured.

Plaintiff filed with the Claims Court the complaint in No. 122–85C on February 28, 1985, requesting the termination be found improper and that it receive equitable adjustments for government-caused conditions. On March 11, 1985, plaintiff submitted a certified claim to the contracting officer for $867,788. The contracting officer has not issued a decision regarding the claim. The claim in No. 343–85C was filed on June 7, 1985, stating the same causes of action as in No. 122–85C, but requesting, in the alternative, either equitable adjustments or breach of contract damages. On August 15, 1985, defendant's motion to consolidate the two cases was allowed. Subsequently, on October 11, 1985, plaintiff filed an amended complaint in No. 122–85C adding the cause of action which is the subject of the plaintiff's motion and defendant's cross-motion for summary judgment, *i.e.*, that the defendant waived the contract completion date rendering the default termination for failure to complete on time improper. Thus, plaintiff claims the government's action was in breach of contract entitling the plaintiff to damages.

*Discussion*

The plaintiff relies on *DeVito v. United States*, 188 Ct.Cl. 979, 413 F.2d 1147 (1969), which it claims sets forth the proposition that "[t]he Government is estopped from terminating a contract from default for failure to meet the completion date, if the Government encourages continued performance, but does not terminate within a reasonable time or does not set a new completion date." The court in *DeVito* explained, at 990–91, 413 F.2d 1147, the rule regarding the waiver of the right to terminate:

Where the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to terminate, assuming the contractor has not abandoned

2. The work under the Takeover Agreement was performed by an entity called "Barker Circle Trust." Based on the record, the "Barker Circle Trust" and plaintiff are one and the same.

performance and a reasonable time expired for a termination notice to be given. * * * The necessary elements of an election by the nondefaulting party to waive default and delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.

* * * The period for termination after default will naturally be greater where the contractor abandons performance or where his situation is such as to render performance impossible or unlikely, than where he continues performance in reliance on the lack of termination and proceeds to incur obligations in efforts to perform * * *.

The plaintiff claims the following facts support its position and mandate that, under the law, plaintiff is entitled to summary judgment that the government improperly terminated the Takeover Agreement: The contract completion date was July 20, 1984; the defendant did not terminate on July 20, 1984, but instead requested and allowed the plaintiff to continue performance; the government never set a new contract completion date; and, in reliance thereon, the plaintiff continued to perform until the contracting officer terminated the Agreement on October 12, 1984.

The defendant argues that neither the courts nor the boards of contract appeals have held that the *DeVito* rule "is as applicable to a construction contract, such as the one at issue here, as it is to supply contracts, such as the one at issue in *DeVito*." Moreover, according to defendant, even if *DeVito* does apply, there was no waiver of the completion date herein because plaintiff had notice that the government was considering terminating the Agreement and that its continued performance was solely for the purpose of mitigating its liability.

In *Administration of Government Contracts,* by Cibinic and Nash (1981), the authors state at page 436 that "[w]aiver has been a more significant issue in supply contracts than in construction contracts. The supply contractor who continues performance while in default incurs costs which will not be recovered if the Government later successfully terminates for default. * * * However, in construction contracts the contractor will be reimbursed for acceptable work performed at the site even if the contract is terminated. For this reason, continued performance alone will not ordinarily support a claim of waiver * * *."

With respect to the issue of waiver of the contract completion date, in *Brent L. Sellick,* ASBCA 21869, 78–2 BCA ¶ 13,510 (1978), the board stated at 66,194–95:

The essence of the waiver of the delivery date doctrine as explained in *DeVito* * * * is that through Government actions or inactions, and contractor reliance thereon, the Government is estopped from enforcing a specified contractual delivery date. However, as explained by this Board in recent cases, this estoppel rationale is not normally applicable where the contract contains the usual provisions applicable to construction contracts entitling the contractor to payment for work performed subsequent to the specified completion date but also entitling the Government to recover liquidated damages for late completion. With such provisions in the contract, detrimental reliance on the contractor's part cannot be found merely from a period of Government forbearance coupled with continued contractor performance in reliance thereon. *Olson Plumbing & Heating Co.,* ASBCA Nos. 17965, 18411, 75–1 BCA ¶ 11,203; * * * *Joseph Morton Company, Inc.,* ASBCA No. 19793, 78–1 BCA ¶ 13,173. Moreover, with these provisions in the contract Government encouragement to expedite completion during a forbearance period should not be interpreted as a disestablishment of the contractually-prescribed completion date absent further manifestation by the Gov-

ernment that it no longer considered that date to be enforceable. Such a disestablishment was indeed found in *Corway, Inc.*, ASBCA No. 20683, 77–1 BCA ¶ 12,357, where the Government neither mentioned nor assessed liquidated damages and otherwise manifested lack of concern with the contractor's late completion. Under those circumstances, the *De-Vito* doctrine was invoked with recognition that *the case was unusual.*

(Emphasis added.)

In *Olson Plumbing & Heating Co. v. United States*, 221 Ct.Cl. 197, 602 F.2d 950 (1979), involving a construction contract, the court considered the waiver issue on its merits, finding that the contractor did not meet the burden of establishing Government waiver and contractor reliance. The court in *Olson Plumbing & Heating Co.* stated, at 204, that the question of whether a default termination is proper depends upon the facts and circumstances of each case, citing *DeVito*, 188 Ct.Cl. at 991, 413 F.2d 1147. In *Olson Plumbing & Heating Co.*, the court found the contractor had abandoned performance and thus the government could not be found to have waived the due date or to have elected continued performance by the contractor. In addition, the court found that, where the right to terminate a contract has been expressly preserved or when liquidated damages have been imposed by the nonbreaching party, the other party has a heavier burden of proving that the right to terminate for failure to deliver on time has been waived. In *Overhead Electric Co.*, ASBCA No. 25656, 85–2 BCA ¶ 18,026, the board recognized that it takes unusual circumstances for the *DeVito* rule to be applied in construction contract cases. Yet, the board found the government's default termination based on a contractor's failure to meet the construction contract completion date improper. The government had taken no action to terminate the contractor's right to proceed after the completion date passed and never stated its intent to assess liquidated damages. In addition, the government had withheld progress payments for work the contractor had completed. Under these circumstances, by permitting the completion date to expire without action, and by not establishing a new completion date, the government waived the completion date and could not terminate for default based on the contractor's failure to meet the waived completion date. However, in *Mitchell Engineering & Constr. Co.*, 78–1 BCA ¶ 13,112, the board held the government properly terminated a contract for the construction of a steel building for default, despite its failure to set a new completion date after the original one passed. The board found the contractor failed to do the work even though it had more than a reasonable time between the original completion date and the time of termination within which to perform the contract. The board stated "the government is not precluded from terminating for default if the contractor fails to make reasonable progress during the forbearance period. * * * Failure to perform within that time has the same effect as if the time had been originally stated in the contract." Furthermore, in *Kenneth L. Yates, Inc.*, ASBCA No. 31225, 86–2 BCA ¶ 18,908, the board held the government had no obligation to establish a new completion date for a construction contract after the contractor abandoned the work site, completing only 30 percent of the contract work. The board found that *Overhead Electric Co.* did not support the contractor's position that the government waived the contract completion date by failing to establish a new completion date. That is, in *Overhead Electric Co.*, the contractor was willing and able to complete the work as it had all the necessary material and labor available and the government never mentioned liquidated damages. In *Yates*, the government notified the contractor that liquidated damages were being assessed and thus the contractor was on notice the contract completion date was not being waived. The board in *Yates* said *Overhead* represents a rare exception to the general inapplicability of the waiver concept to construction contracts.

In this case, the plaintiff argues the facts and circumstances require the appli-

cation of the *DeVito* waiver rule. Plaintiff claims the *DeVito* rule is based on the principle of fairness. In this connection, a construction contractor would be as prejudiced as a supply contractor by continued performance past the completion date. In particular, plaintiff argues that construction contractors are not entitled to recover all of their costs of continued performance but may only recover "the value of the work performed," which may not exceed the unit prices in the contract. In addition, a construction contractor who is terminated for default may recover the value of materials delivered to the site but is not entitled to recover the cost of materials purchased prior to default if such is higher than value. According to plaintiff, the Takeover Agreement does not authorize payments for materials which had not been delivered to the site. Thus, the contractor would not be entitled to recover for construction materials ordered after the contract completion date but not delivered to the site prior to the contract being terminated for default. Plaintiff also claims a defaulted construction contractor is not entitled to recover all of its overhead costs because overhead costs are recovered by allocation to the unit prices of contract line items as a percentage of direct costs. That is, the same overhead percentage is allocated to each contract line item but certain work items require more overhead than others which becomes an issue if a contractor is terminated before completion.

In reply, defendant states that plaintiff received progress payments prior to the default termination and that plaintiff has not explained what specific unreimbursed expenses it incurred between the original completion date and the default termination. Also, defendant urges that, as the surety for the original defaulted contractor, plaintiff's performance under the contract was one way to mitigate its liability to the government. That is, plaintiff's continued performance could only help, not hinder, its position as the performance bond surety because that much less remained to be done in completion of the contract after the default termination. Thus, to the extent plaintiff remained responsible for completion of the contract work, the more it completed the better. Moreover, plaintiff could still be assessed reprocurement costs.

Plaintiff responds that, as the surety, it was forced to complete the contract when Arctic defaulted, but there was insufficient money left under the contract to complete performance as required by the Takeover Agreement. Therefore, plaintiff's continued performance, after the completion date passed and the government did not terminate the contract, resulted in plaintiff incurring costs which would not be reimbursed.

In summary, plaintiff's claims seem to all relate to the premise that a defaulted construction contractor is as prejudiced as a defaulted supply contractor who continues performance past the completion date and, thus, the waiver rule should equally apply. Defendant, in essence, argues construction contractors, and the plaintiff in particular, are not harmed, as supply contractors would be, by continued performance and, therefore, the waiver rule should only apply under exceptional circumstances.

In *DeVito*, the government was held to have waived its right to terminate for default. In that case, the court set forth the proposition that the facts and circumstances of each case determine what is a reasonable time for the government to terminate a contract after default. There is no question that the *DeVito* rule has been considered to determine its applicability to construction contract cases as well as to supply contract cases, by the Claims Court (*see Boston Shipyard Corp. v. United States*, 10 Cl.Ct. 151 (1986)), the Court of Claims (*see Olson Plumbing & Heating Co. v. United States*, 221 Ct.Cl. 197, 602 F.2d 950 (1979)), and the boards of contract appeals (*see, e.g., Corway, Inc.*, 77–1 BCA ¶ 12,357 (1977)). Thus, the plaintiff is correct that the *DeVito* rule has been applied in the construction contract context. However, the defendant is also correct in that the waiver rule has only been applied when exceptional or rare circumstances are presented in a construction contract case.

In this case, therefore, the actions and/or inactions of the parties between the original completion date and the termination date must be considered to determine if they present circumstances and facts requiring the application of the *DeVito* waiver rule. The court in *DeVito* made its finding largely based on the following facts. The government did not terminate for 48 days after the delivery date passed, for 35 days of which there was no government action or explanation to the supply contractor for the delay in termination. At the same time, the contractor was making every effort to compensate for past problems and to catch up on delivery requirements, "by augmenting its payroll, letting subcontracts expeditiously, purchasing additional tooling, and performing some of the machining itself." In *DeVito*, the contractor did not know that a decision to terminate had been privately made by the contracting officer and was subject only to higher approval, when he incurred obligations in efforts to perform. Thus, the 48 day delay in termination was not reasonable under the circumstances. The court stated, at 188 Ct.Cl. 991–92, 413 F.2d 1147, "the inference is created that time is no longer of the essence so long as the constructive election not to terminate continues and the contractor proceeds with performance. The proper way thereafter for time to again become of the essence is for the Government to issue a notice under the Default clause setting a reasonable but specific time for performance on pain of default termination. The election to waive performance remains in force until the time specified in the notice, and thereupon time is reinstated as being of the essence." The actions and/or inactions of the parties in the present case do not directly correspond with those described above.

The actions taken by the government after the completion date passed in *Olson Plumbing & Heating Co. v. United States*, 221 Ct.Cl. 197, 602 F.2d 950, are more similar to those taken in this case. That is, in *Olson* the government, instead of terminating the contractor for default for failure to deliver on the proper date, sent two letters indicating it was not waiving any rights under the contract and that liquidated damages would be assessed against the contractor until the project was completed. As mentioned previously, the court said, at 204, "[w]here the right to terminate has been expressly reserved or when liquidated damages have been imposed by the non-breaching party, the other party has a heavier burden of proving that the right to terminate for failure to deliver on time has been waived." In this case, the right to terminate was expressly reserved by the government in communications with plaintiff.[3] Furthermore, liquidated damages were imposed by the government, as indicated in the Takeover Agreement with plaintiff, commencing on March 2, 1984.[4] Liquidated damages were to be "assessed at the rate of $200 per calendar day until the work required by the contract is completed by the Surety." In a letter from the contracting officer, dated September 7, 1984, it is stated that liquidated damages will continue to accrue until contract completion. Thus, as the court said in *Olson* at 205, 602 F.2d 950: "The Government's express reservation of its rights and the assessment of liquidated

---

3. In the July 27, 1984 reply by the contracting officer to plaintiff's response to the government's cure letter, plaintiff was given 10 days to explain its failure to make adequate progress and to not having completed the work by July 20, 1984. Plaintiff was notified that the government was considering termination but might forbear this result if, within ten days of receipt of the notice, plaintiff made the required demonstration. This letter concludes, as does one of September 7, 1984: "Any assistance rendered to you on this contract or acceptance by the Government of delinquent goods or services hereunder will be solely for the purpose of mitigating damages, and is not to be construed as an intention on the part of the Government to condone any delinquency, or as a waiver of any rights the Government may have under subject contract."

4. As stated in the Takeover Agreement, the government's position was that the principal contractor, Arctic, failed to prosecute the work required by the contract with the necessary diligence so that it was impossible to complete by the required date of March 1, 1984. Thus, liquidated damages were assessed as of March 2, 1984.

damages surely made clear to plaintiff that the Government was not excusing the breach. Liquidated damages * * * are a cost of being in breach. * * * Their imposition is evidence of the intent to hold the defaulting party liable for its delayed performance." The letter of September 7, 1984 is also important because it indicates the plaintiff had advised the government it was suspending work and that the government had notified plaintiff that a suspension was not authorized. In addition, the government made clear its concern regarding the further delay in completion of the project. Plaintiff also relies on this letter to support its argument of government forbearance, based on the following language: "[T]he Government will forbear in terminating the contract only until 1 October 1984, subject to satisfactory progress in reaching agreement on contractor substitution. If satisfactory progress in reaching agreement is not made or if a written agreement is not consummated between us by 1 October 1984, the contract will again be subject to termination for default." However, as mentioned in n. 3, *supra,* the government made clear it was not waiving any contract right or condoning any delinquency by assistance rendered or acceptance of delinquent services or goods. As the court stated in *Pelliccia v. United States,* 208 Ct.Cl. 278, 292–93, 525 F.2d 1035 (1975), a contracting officer should not have to immediately terminate a contract, after a contractor's failure to meet a delivery date, on pain of waiving the right to do so as "[f]airness to the contractor requires that the contracting officer allow a reasonable time within which the contractor may endeavor to demonstrate that its failure to deliver was excusable." The court continues, at 293, 525 F.2d 1035: "Even when the delay is found not to be excusable, the contracting officer should have a reasonable time within which to determine whether a default termination would be in the best interest of the Government as the nondefaulting party." [5] Thus, the fact that the contracting officer did not immediately, after the plaintiff's failure to meet the July completion date, act to terminate the contract for default does not mean the government waived its right to do so, especially since the plaintiff was advised that the government was preserving all of its rights and was considering termination if certain conditions were not met. The plaintiff was given a chance by the contracting officer to explain its failure to make substantial progress on the contract work. The contracting officer had to have time to consider whether default termination was in the best interest of the government. In addition, plaintiff was on notice that time remained of the essence because liquidated damages continued to be assessed. Moreover, even after the completion date passed, a progress payment was made pursuant to plaintiff's request, according to defendant [6] and not controverted by plaintiff. Any progress payment would reduce the amount of plaintiff's expenses for which it has argued the government will not reimburse it, if the default termination is allowed to stand. Thus, even if, as plaintiff claims, it relied on the government's failure to terminate the contract to continue to perform work and to incur expenses, such reliance does not necessarily result in financial harm thereby.[7] That such reliance on plaintiff's part would not result in financial hardship is apparent, in particular, since the plaintiff

---

**5.** *See, e.g., Pelliccia v. United States,* 208 Ct.Cl. 278, 293, 525 F.2d 1035, in which the court considered a clause in the government's "show cause" letter, which is virtually identical to the one mentioned in n. 3 regarding the intentions of the government to not condone the contractor's delinquency or to waive any right under the contract, in reaching its decision.

**6.** Affidavit of Andrew A. Dellomo, contracting officer. Plaintiff's invoice covering the period of May 23, 1984 to August 13, 1984 was paid by the government on October 5, 1984.

**7.** *See Joseph Morton Co.,* 78–1 BCA ¶ 13,173, at 64,411 (1978), wherein the board found that, when a contractor receives payment (progress payments) for continued performance after the completion date on a construction contract has passed, he or she is not harmed by government failure to enforce the contract schedule. Thus, government forbearance for a reasonable time under the contract was not inconsistent with a subsequent termination for default or assessment of liquidated damages.

as the performance bond surety had ongoing financial responsibilities until the contract work was completed. These responsibilities would not end when plaintiff abandoned work or when the original completion date passed. In addition, as plaintiff states, its reimbursement for contract work was specifically set forth in the Takeover Agreement. Its financial expectations, based on this Agreement, appear to be limited to monies remaining to be paid as specified under the contract, even if additional expenses were incurred in completion of the contract work.

Given all these circumstances, this case does not present that exceptional situation pursuant to which the *DeVito* waiver rule will be applied in a construction contract case. In sum, the government did not waive its right to terminate the plaintiff for default by its failure to do so between July and October 1984. Therefore, contrary to plaintiff's argument, it is unnecessary to consider the requirement of *International Telephone & Telegraph Corp. v. United States*, 206 Ct.Cl. 37, 509 F.2d 541 (1975), that, once there has been a waiver in a breach situation, for time to again become of the essence and for the government to regain the right to terminate a contractor for default, a new date must be established. This is so because there had been no waiver by the government in this case and time remained of the essence. Thus, no new date needed to be established in order for the government to terminate for default in October based on plaintiff's failure to meet the July completion date or to make substantial progress thereafter up until the time when the contracting officer terminated the Takeover Agreement. *See, e.g., Mitchell Engineering & Constr. Co.,* 78–1 BCA ¶ 13,112 (1978), *aff'd mem.,* 225 Ct.Cl. 653, 650 F.2d 290 (1980).

Therefore, it is ORDERED:

(1) Plaintiff's motion for summary judgment is denied, defendant's motion for partial summary judgment as to Count 6 is granted; and

(2) On or before March 14, 1988, counsel shall file a "Status Report(s)" with the clerk indicating the procedure(s) proposed to obtain the resolution of the remaining issues in this litigation.