ABCON ASSOCIATES, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–574C.

United States Court of Federal Claims.

Sept. 20, 1999.

Jon N. Kulish, Washington, DC, for plaintiff. Louis N. Haas, Haas & Najarian, San Francisco, CA, of counsel.

Michael F. Kiely, Washington, DC, with whom was Acting Assistant Attorney General David W. Odgen, for defendant. Karren Dickson Vance, United States Postal Service, of counsel.

## OPINION

MILLER, Judge.

This matter is before the court on the parties' cross-motions for summary judgment on Counts III and IV of the complaint.[1] The decisive issue is whether the Government waived the delivery schedule under the contract and, therefore, wrongfully terminated the contractor without affording an opportunity to cure. Argument is deemed unnecessary.

### FACTS

The facts in this case are undisputed, unless otherwise noted. On April 29, 1996, the United States Postal Service (the "USPS") awarded Abcon Associates, Inc. ("plaintiff"), Contract No. 415046–96–B–0050 for the extension of the loading dock and the installation of three freight elevators at the USPS Queens Processing and Distribution Center located in Flushing, New York. Under the terms of the contract, plaintiff was to commence performance within ten days of receipt of the Notice to Proceed and to complete performance within 510 days. Work under the contract was divided into two phases, each with its own completion deadline. Phase 1 was further divided into Phases 1a and 1b. Phase 1a was to commence immediately and be completed by April 1, 1997. Phase 1b was to commence immediately and be completed by December 1, 1996. Phase 2 was to commence on April 1, 1997, and be completed by October 1, 1997.

Plaintiff received the Notice To Proceed on May 1, 1996. The Notice To Proceed identified September 23, 1997, as the completion date for all work. Plaintiff commenced performance of Phase 1 in May 1996. Shortly thereafter, plaintiff discovered discrepancies between the project drawings and the actual conditions in the USPS facility.

In the Phase 1a interior work, plaintiff discovered that the section of concrete flooring to be removed according to the USPS plans was too small for the foundation work that was to be performed in and around the elevator pit. Plaintiff orally requested that the contracting officer and the architect engineer resolve the design discrepancy. Plaintiff sent three Requests for Information ("RFIs") regarding other concrete and steel work in the elevator foundation area to the contracting officer's representative and the architect engineer. The RFIs were numbered 5, 13, and 23 and were dated September 12, September 26, and October 3, 1996, respectively. The USPS requested that plaintiff provide its own shop drawings to remedy the elevator foundation problems.

On November 15, 1996, plaintiff discovered differences between the USPS drawings and the actual condition of the Phase 1 exterior asphalt work. New pavement could not be laid without the gradient exceeding the 5% slope limitation in the USPS plans. Plaintiff notified the architect engineer of this problem by telephone on November 15, 1996. Six days later, plaintiff submitted RFI No. 038 addressing the gradient problem. Plaintiff then submitted RFI No. 042 for a problem with the transition gradient from the old asphalt to the new asphalt.

The Phase 1b completion deadline passed without delivery of the finished product. By its December 17, 1996 letter, the contracting

---

1. This case was reassigned to the undersigned on August 13, 1999.

officer's representative informed plaintiff that it was in default and that the USPS could terminate the contract if plaintiff were not to cure the default. During the same month, the USPS began withholding the liquidated damages stipulated in the contract.

The USPS provided its own design plans for the Phase 1a difficulties on January 23, 1997. The USPS informed plaintiff that it was to implement the solution with no addition cost to the USPS and with no extension of time.

The contracting officer notified plaintiff by a February 5, 1997 letter that the USPS was "considering terminating" the contract. This letter indicated that the default was based on a failure "to submit an acceptable project schedule." It provided for a February 14, 1997 meeting at which plaintiff could present its position on the issue of the Phase 1b default.

At the February 14, 1997 meeting, Contracting Officer David Weglinski indicated that some of the performance problems were not entirely plaintiff's fault. He stated that the parties should work toward a joint solution. During private discussions after the meeting, the contracting officer indicated to plaintiff that he wanted to find a mutually satisfactory resolution that would assure completion of the project.

Plaintiff sent a letter dated March 3, 1997, to the contracting officer as a response to the February 5, 1997 show-cause letter. Mr. Weglinski considered this response unnecessary because he "was satisfied with. the presentations that there was a rationale, a justification why [plaintiff was] unable to meet the completion date." Deposition of David Weglinski, Oct. 20, 1998, at 32. No further communications regarding the show-cause letter occurred until December 31, 1997, more than nine months later.

The Phase 1a deadline of April 1, 1997, passed without completion. Phase 2 was not commenced on April 1, 1997, as required by the contract. On April 23, 1997, the parties met to discuss unresolved issues. At this meeting plaintiff offered a new schedule that included completion of Phase 1 within four months of the meeting and of Phase 2 within three months thereafter, yielding proposed deadlines of August 23, 1997, and November 23, 1997, respectively. According to the minutes of the meeting, the contracting officer "concurred" with the proposed deadlines.

The scope of this concurrence is disputed by the parties. Plaintiff contends that the contracting officer's concurrence indicates a modification of the work schedule. The USPS counters that the concurrence was not a modification of the contract, but merely an effort to ascertain fixed dates by which the USPS would be able to use the freight elevators and the renovated loading dock. At no time prior to the December 31, 1997 termination for default did the USPS change any completion dates by contract modification.

In May and June 1997, plaintiff received design solutions for the outstanding problems. Plaintiff continued to perform while liquidated damages mounted.

By August 5, 1997, plaintiff submitted Modification Requests 2 through 20 by which plaintiff sought additional compensation and time to complete the contract. Plaintiff based the Modification Requests on what it perceived to be design defects, differing site conditions, or USPS-directed changes. The parties met at least twice during August to discuss potential contract modifications and settlement of plaintiff's claims for money.

At the August 14, 1997 meeting, plaintiff represented that it would not be able to complete phase 2 by December 12, 1997.[2] According to the minutes of this meeting, a USPS representative inquired of plaintiff how its "schedule [would] be effected if the USPS asked [plaintiff] to begin construction of Phase 2 in January 1998." The meeting generated no resolution of the 19 Modification Requests.

In late August 1997, the USPS authorized the release of a portion of the liquidated damages that it had retained. The authori-

---

2. This is the first appearance of the December 12, 1997 date in plaintiff's proposed findings. See Plf's Proposed Findings of Fact No. 75, filed Nov. 30, 1998. No indication is present that December 12, 1997, was ever discussed as a completion date for Phase 2. The only Phase 2 completion dates indicated in plaintiff's proposed findings are October 1 and November 23, 1997.

zation was made despite the fact that plaintiff continued to represent that it could not prepare an accurate construction schedule and that phase 1 was incomplete. Plaintiff's proposed Phase 1 deadline of August 23, 1997, passed without completion. The contract deadline for Phase 2 passed on October 1, 1997, without delivery. On October 3, 1997, plaintiff received a distribution equal to the full amount of liquidated damages collected to date by the USPS.

Plaintiff submitted a formal request for an extension of the contract performance date on October 15, 1997. The contracting officer rejected the request by letter dated October 27, 1997. The USPS provided plaintiff an inspection report for Phase 1b detailing the work that needed to be performed for Phase 1b to be considered complete. Plaintiff's proposed Phase 2 completion date of November 23, 1997, passed without delivery.

During the entire duration of the contract between the USPS and plaintiff, plaintiff continued to work on the project, and the USPS continued to review plaintiff's work and to make payment thereon. Some dispute exists as to the amount of work performed by plaintiff or the amount of access to work areas available to plaintiff during the December 1997 Christmas season. The parties engaged in meetings, telephone communication, and correspondence on a consistent basis throughout the duration of their relationship.

The contracting officer issued final decisions on December 29 and 30, 1997, with regard to the nineteen Modification Requests. On December 30, 1997, the contracting officer unilaterally modified the contract and withheld distribution of liquidated damages for the period from plaintiff's original December 1996 default through termination. By letter of December 31, 1997, the contracting officer terminated the contract. Plaintiff then brought this suit.

**3.** Defendant appended two declarations to its last brief. The substance of David Weglinski's March 11, 1999 declaration is that any termination of the contract before plaintiff had offered a written explanation of the delay would have been premature. Dane A. Weir's March 11, 1999 declaration indicates that the contracting officer needed time to evaluate all of the requests for modifica-

## DISCUSSION

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c). Genuine disputes over material facts that may significantly affect the outcome of the matter, preclude an entry of judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (finding dispute to be genuine if jury could find in favor of non-moving party). Having cross-moved, each party bears the burden of demonstrating entitlement to judgment, as well as the absence of issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response to the other's motion, each party must provide evidence that is more than merely colorable. *See id.* at 324, 106 S.Ct. 2548 (noting that evidence need not be admissible at trial); *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir.1984); *see also Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir.1988). Evidence may be presented in the form of affidavits by knowledgeable persons.[3] *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. However, mere assertions or conclusory allegations are insufficient. *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985) (noting that non-movant must demonstrate an evidentiary conflict by more than conclusory statements or mere denials).

When resolving a motion for summary judgment, the court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Jay v. Secretary of DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993). The non-movant is entitled to "all applicable presumptions, inferences, and intendments." *H.F.*

tion. Defendant may not submit these declarations for the court's consideration without plaintiff being afforded the opportunity to address them. The court has two options: reopen the briefing or disregard the declarations. The court is disinclined to reopen briefing at this late date and therefore does not rely on these declarations in making its decision.

*Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984). Although summary judgment is designed "'to secure the just, speedy and inexpensive determination of every action,'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1); *see Avia Group Int'l,* 853 F.2d at 1560, a trial court may deny summary judgment when "there is reason to believe that the better course would be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

Plaintiff contends that the termination on December 31, 1997, was wrongful because the USPS failed to provide it with an opportunity to cure, maintaining that the contract obligates the USPS to provide a ten-day cure notice before terminating for failure to make progress. Plaintiff further argues that the USPS waived the contracted-for delivery date and that, therefore, the USPS could not terminate plaintiff for failure to meet the delivery date. Defendant responds that the USPS terminated plaintiff for failure to meet delivery deadlines, a termination that requires no advance notice, and that the USPS never waived the delivery date. The court first addresses the second issue because resolution of the waiver issue is a necessary element for an adjudication of the propriety of the termination for default.

### 1. *Waiver of construction schedule*

Plaintiff proffers that the USPS waived, either expressly or constructively, the delivery schedule. Defendant counters that plaintiff cannot prove any facts in support of waiver, thereby entitling defendant to judgment as a matter of law on Count IV.

 The Government can waive contracted-for deadlines. *See DeVito v. United States,* 188 Ct.Cl. 979, 990, 413 F.2d 1147, 1153 (1969). Waiver results from (1) the Government's "failure to terminate within a reasonable time after the default under circumstances indicating forbearance" and (2) "reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent." *Id.* at 991, 413 F.2d at 1154. When the Government waives a deadline, it must set a new deadline unilaterally or bilaterally. *See*

*id.* at 991–92, 413 F.2d at 1154. When the government, through the creation of a new deadline, reestablishes that time is of the essence, it must give notice to a contractor and provide a reasonable opportunity to meet the new deadline. *See id.,* 413 F.2d at 1154.

 Much as the Government can waive its rights under a contract, it can also preserve them, such that forbearance would not permit reliance by the defaulting party. *See Olson Plumbing & Heating Co. v. United States,* 221 Ct.Cl. 197, 204–05, 602 F.2d 950, 955 (1979); *see also Brent L. Sellick,* 78–2 BCA ¶ 13,510, at 66,194–195, 1978 WL 2372. The Government can retain its rights by expressly indicating as much to the other party or by assessing liquidated damages. *See Olson Plumbing & Heating,* 221 Ct.Cl. at 204, 602 F.2d at 955. Preservation of termination rights places a "heavier burden of proving that the right to terminate for failure to deliver on time has been waived." *Id.,* 602 F.2d at 955. For construction contracts, "continued performance alone will not ordinarily support a claim of waiver." *Indemnity Ins. Co. of N. Am. v. United States,* 14 Cl.Ct. 219, 222 (1988) (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 436 (1981)).

 Plaintiff argues that the course of dealing between the parties—encouragement by the USPS to continue work, relinquishment of liquidated damages, discussion of delivery dates that were outside of the deadlines—vitiates the previously established delivery deadlines. According to plaintiff, the ten-month delay between the issuance of the show-cause letter and the actual termination and plaintiff's continued work in reliance on the USPS' forbearance meet the threshold for waiver under *DeVito* and *Sun Cal, Inc. v. United States,* 21 Cl.Ct. 31 (1990).

In *DeVito* the U.S. Army Signal Corps granted the contractor a contract for the production of wire-splicing kits. Although plaintiff was to deliver the kits in increments over the course of nearly one year, plaintiff failed to meet the first incremental deadline, making partial deliveries due to subcontractor problems. Less than two months after plaintiff missed the first deadline, the con-

tracting officer terminated the contract for failure to make timely deliveries. The court held such a delay to be unreasonable because a notice sent to plaintiff indicated that termination for failure to meet deadlines would be "immediate," *DeVito,* 188 Ct.Cl. at 987, 413 F.2d at 1152; because the procurement regulations required termination *"at once"* in default situations, *id.* at 989, 413 F.2d at 1153; and because the contracting officer's request for authority to terminate languished in the military chain of command for 48 days for no apparent reason, *see id.,* 413 F.2d at 1153. Such delay, the court held, was unreasonable and could have given rise to, and caused reliance upon, the inference that the Signal Corps waived the delivery schedule. The reported opinion does not indicate whether the contracting officer retained the right to terminate the contractor for default or whether the contracting officer did levy, or could have levied, liquidated damages against plaintiff—circumstances present in the case at bar.

The contractor in *Sun Cal* entered a contract with the U.S. General Services Administration (the "GSA") for the construction and lease of office space. Plaintiff failed to meet the delivery deadline. After the deadline passed, the GSA encouraged plaintiff to continue its construction efforts. The contractor and the GSA subsequently reached an agreement covering a supplement to the lease in which the GSA waived its rights to liquidated damages. The contracting officer notified plaintiff that the GSA intended to execute the agreement, but that the GSA would not be bound until it did so. The GSA never executed the lease supplement. In an October 19, 1984 letter, the contracting officer provided as the reason for termination the failure to meet the original March 1, 1984 deadline. The court held that negotiations for the lease modification, including an alteration to the original contract's liquidated

damages and termination clauses, waived the right to terminate. No indication is present that liquidated damages were ever assessed, though the GSA had the right to do so under the contract, or that the GSA retained its right to terminate after the original default— again circumstances present in the case at bar.

*DeVito* and *Sun Cal* are distinguishable from the instant case as they address default situations in which the Government did not reserve the termination rights.[4] In the instant case, the USPS notified plaintiff that it reserved its rights and that any assistance or forbearance would not signal waiver. *See, e.g., Pelliccia v. United States,* 208 Ct.Cl. 278, 286, 290, 525 F.2d 1035, 1040, 1043 (1975) (discussing show-cause letter containing language similar to that in instant case and reasoning that reliance on *DeVito* is not appropriate when contractor is on notice of reservation of right to terminate). Moreover, the USPS levied liquidated damages.

In *Olson Plumbing & Heating,* the Air Force awarded plaintiff a contract to install a hot water line. The specifications were incomplete and the supplier of the line was responsible for completing them. After a series of contract extensions, the contractor failed to meet the September 8, 1971 finish date. Instead of terminating the contract when plaintiff failed to deliver, the Air Force informed plaintiff that it was permitting work to continue, that it was not waiving its rights, and that it was enforcing the contract's liquidated damages clause. Plaintiff and the Air Force continued to meet and work on the pipe deficiencies for almost a year. The Air Force terminated the contract for default on October 17, 1972, more than a year after the default date. The liquidated damages collected were also reduced. In short, the Air Force "permitted 13 months to pass after the due date and before it termi-

---

4. Similarly, in *SIPCO Services & Marine Inc. v. United States,* 41 Fed.Cl. 196 (1998), NASA never objected to SIPCO's delinquency—that is, it never levied liquidated damages or issued a letter reserving termination rights after the default had occurred. Although the U.S. Air Force in *Martin J. Simko Construction, Inc. v. United States,* 11 Cl.Ct. 257 (1986), *vacated,* 852 F.2d 540 (1988), did levy liquidated damages, it did not indicate to

plaintiff that any assistance rendered would not rise to the level of waiver. Plaintiff, therefore, could have relied upon the Air Force's encouragement and assistance as an indicator of waiver; however, in the instant case, plaintiff could not have relied upon the USPS' actions because it was on notice that such actions were solely for the purpose of mitigating damages.

nated the contract, encouraged plaintiff to continue to perform, and did not set a new delivery date." *Olson Plumbing & Heating,* 221 Ct.Cl. at 204, 602 F.2d at 955. Because the Air Force sent plaintiff letters notifying it of its default and reserving the right to terminate and the Air Force's right to liquidated damages, the contractor was not "unwary" because it "knew that it was in breach." *Id.* at 205, 602 F.2d at 955.

In the instant case, the USPS provided plaintiff with notice that it did not intend to waive its right to terminate plaintiff for default. After indicating a "failure to perform," the February 5, 1997 letter reads:

> Any assistance rendered to you on this Contract or acceptance by the U.S. Postal Service of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages and is not to be construed as an intention on the part of the U.S. Postal Service to condone any delinquency, or as a waiver of any rights the U.S. Postal Service may have under the subject Contract.

The USPS also assessed liquidated damages from December 1996 and repeatedly and steadfastly refused to grant any extensions of time for plaintiff's performance.

Much as in *Olson Plumbing & Heating,* plaintiff in this case was permitted and encouraged to continue work and no new delivery dates were set. Also, much like that case, the USPS retained its rights, forestalling the reliance necessary for waiver.

Plaintiff cannot satisfy the second part of the *DeVito* test for waiver because it could not permissibly rely upon the USPS' forbearance. Plaintiff was on notice that the USPS' forbearance, and even its assistance, could not constitute waiver. Once plaintiff received such notice, under the terms of the contract, all its efforts were directed toward mitigating damages and at its own peril. *See, e.g., Ra–Nav Lab., Inc. v. Widnall,* 137 F.3d 1344, 1345–46 (Fed.Cir.1998) (discussing mitigation and risks assumed by contractor that performed after termination and notice that further work would only mitigate damages and would be at contractor's own risk).[5]

### 2. Propriety of termination for default

Plaintiff argues that the final decision dated December 31, 1997, was a termination for failure to make progress. A termination for failure to make progress, according to plaintiff, obligated the USPS to provide a ten-day cure notice. Defendant rejoins that the letter suffices to notify plaintiff that it was being terminated for failure to meet deadlines.

■■■ Termination for failure to make progress is distinct from termination for failure to meet contracted-for deadlines. *See Universal Fiberglass Corp. v. United States,* 210 Ct.Cl. 206, 216, 537 F.2d 393, 398 (1976). When a contractor continues performance, termination prior to a delivery deadline is termination for failure to make progress. *See id.* at 216–17, 537 F.2d at 398. Once the delivery date has passed, any termination constitutes termination for failure to meet a performance deadline. *See id.,* 537 F.2d at 398. The contract itself and the *USPS Procurement Manual, see USPS Procurement Manual* § 6.9.3, at 181–85 (1995), *incorporated in* 39 C.F.R. § 601.100 (1995), recount the same distinction. To terminate for a failure to make progress, an agency must provide a ten-day cure notice under the terms of the contract, whereas a termination for failure to meet deadlines requires no such notice.

■■■ Plaintiff argues that its termination was one for failure to make progress, posit-

---

5. The 38–day period between the November 23, 1997 deadline set by the putative modification and the December 31, 1997 termination is not sufficient to create a waiver. Section 6.9.3.b.4 of the *USPS Procurement Manual* provides a presumptive 30–day period after failure to meet a deadline during which waiver cannot occur. *See USPS Procurement Manual* § 6.9.3.b.4, at 183 (1995), *incorporated in* 39 C.F.R. § 601.100 (1995). To support waiver beyond this period, plaintiff must have relied upon the actions of the USPS. Plaintiff's simply continuing performance does not suffice to demonstrate reliance. *See Indemnity Ins.,* 14 Cl.Ct. at 222. The proposed findings of fact submitted by the parties do not suggest that the USPS engaged in any action during the last eight days of 1997 that would warrant reliance by plaintiff. Because no reliance has been alluded to after the passage of the November 23, 1997 deadline, plaintiff cannot satisfy the second element of *DeVito* when assessing waiver of the November 23, 1997 deadline.

ing that the original delivery schedule was waived and that no new delivery date was established. Plaintiff bases this contention on the December 31, 1997 termination letter and the October 20, 1998 deposition of Dane A. Weir, the successor contracting officer.

The December 31, 1997 termination letter reads:

> To briefly review the course of this contract, on May 1, 1996, the Postal Service issued the Notice To Proceed to your firm to begin construction. Phase 1b was to be complete and ready for final acceptance by December 1, 1996. Phase 1a was to be complete and ready for final acceptance by April 1, 1997. Phase 2 was to be commence [sic] on April 1, 1997 and be complete by October 1, 1997. As of this date, no contract work is ready for final acceptance.
>
> Reference is made to the letter sent to you on February 5, 1997 in which you were requested to explain why the United States Postal Service should not terminate your contract. In our meeting held on February 14, 1997 you explained various problems Abcon had experienced internally, i.e. high turn over of project managers, the inexperience of your Vice President, and problems with your subcontractors. You assured us you would develop a project schedule and commit to it. *The revised project schedules received were all "drafts" and you have not met any of your verbal commitments.* The United States Postal Service has worked with you in good faith to complete this project. *You have been provided many opportunities to cure the lack of progress.* Be advised we released $210,849.00 in Liquidated Damages to assist you with cash flow problems, however we never forfeited our right and still reserve the right to assess Liquidated Damages in addition to any other remedies available to us under the terms of this contract and by law.

(Emphasis added.) The termination letter reiterates the contract performance deadlines; recounts that these deadlines were never met; and references a February 5, 1997 letter that indicates the potential for a termination for default based on a "failure to perform," not a failure to make progress. The December 31, 1997 letter discusses the failure of plaintiff to meet its verbal commitments to its revised project schedules. The letter also sets forth the liquidated damages to which defendant contends it is entitled. Under the contract liquidated damages are not assessed for failure to make progress; rather, they are warranted only in the context of failure to meet deadlines.

The only language in the letter that may indicate that termination was for a lack of progress is the following sentence: "You have been provided many opportunities to cure the lack of progress." This sentence does not necessarily denote a current lack of progress. It indicates that there was a lack of progress that plaintiff was afforded the opportunity to cure. Once a lack of progress crosses the deadline threshold, it becomes a failure to meet a deadline.

Plaintiff also points to the October 20, 1998 deposition of Contracting Officer Weir to bolster its contention that it was terminated for failure to make progress. The transcript of the deposition reads:

Q. Okay. Now was it your intent in issuing this letter to terminate the contract for a lack of progress by [plaintiff]?

A. Termination for default was issued for lack of progress, yes. Failure to complete the contract.

Q. And are you aware of the distinction which the United States Postal Service Procurement Manual makes between termination for default for failure to make progress versus failure to deliver on time? Are you aware of the different treatment in the manual on those?

A. Off hand, no. I don't know. I would have to look at the manual.

Deposition of Dane A. Weir, Oct. 20, 1998, at 25. The deposition, like the termination letter, is equivocal. The parties themselves agree that there is some ambiguity. *See* Plf's Br. filed Feb. 22, 1999, at 18; Def's Br. filed Jan. 26, 1999, at 10–11.

As noted in *Wilner v. United States,* 24 F.3d 1397 (Fed.Cir.1994), a trial court cannot

defer to the findings of fact in a contracting officer's decision. "[O]nce an action is brought following a contracting officer's decision, the parties start in court ... with a clean slate." *Id.* at 1402. The court does not take as a given that plaintiff was dismissed for a failure to meet deadlines. The court, rather, considers the reasonable inferences that can be drawn from the letter and deposition as well as the propriety of, and type of, termination available to the USPS after it has been determined that no waiver has occurred.

Because the court has ruled that the USPS did not waive the delivery deadlines, termination occurred after the deadlines passed. According to the terms of the contract, the only termination that is appropriate after a deadline has passed is a termination for failure to meet deadlines.[6] *See also USPS Procurement Manual, supra,* § 6.9.3.b.4, at 183. Termination for failure to meet deadlines does not require the USPS to give notice and an opportunity to cure.

Given the context of the letter as a whole, one sentence including the phrase "lack of progress" does not permit a reasonable inference that the letter constitutes a termination for lack of progress. Although Mr. Weir's deposition testimony is ambiguous, such ambiguity does not place into question the significance of the passing of the completion deadlines, which was that the termination was for failure to meet deadlines. Plaintiff was not entitled to a ten-day cure letter. The USPS' termination for default without notice therefore was not improper.

Even construing the contracting officer's "concurrence" in plaintiff's continued performance after missed deadlines most favorably to plaintiff as the opponent of summary judgment, the termination for default is completely within the contractual authority possessed by the USPS. Assuming that the "concurrence" was a modification, the parties agreed, on April 23, 1997, to create new deadlines of August 23, 1997, for Phase 1 and November 23, 1997, for Phase 2. Even with the modified deadlines, plaintiff still failed to complete performance in a timely manner because it did not provide a finished product by the deadlines it suggested. Such a failure to meet deadlines creates the necessary antecedent for termination for default for failure to meet delivery deadlines. If, therefore, the contract were considered to be modified as of April 23, 1997, termination for failure to meet deadlines would still be appropriate.

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment is denied, and defendant's cross-motion for summary judgment is granted. Accordingly,

**IT IS ORDERED,** as follows:

1. Counts III and IV of the complaint are dismissed.

2. The parties shall file a Joint Status Report by October 8, 1999, proposing a course of proceedings for the remaining Counts I–II and V–XI of the complaint.

---

6. Clause H.6.a.2 reads:
 The Postal Services [sic] right to terminate this contract under a.1(b) [the failure to make progress clause] and (c) [failure to perform other terms of the contract not relating to deadlines] above may be exercised if the contractor does not cure the failure within ten days ... after receipt of the notice from the contracting officer specifying the failure.
 No similar notice is called for when terminating a contractor for failure to meet deadlines.