**DECKER & CO., Appellant,**

v.

**Togo D. WEST, Jr. Secretary of the Army, Appellee.**

No. 94–1409.

United States Court of Appeals, Federal Circuit.

Feb. 21, 1996.

---

Luis M. Matos, Attorney, Commercial Litigation Branch, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director and Jeanne E. Davidson, Assistant Director. Also on the brief was Major Robert B. Lloyd, Jr., U.S. Department of the Army, of counsel.

Before PLAGER, RADER, and SCHALL, Circuit Judges.

PLAGER, Circuit Judge.

This is one of those messy government contract dispute cases in which, during the performance of the contract, neither of the parties acquitted themselves with pure grace. Working through the detailed record of such a case causes one to understand better the ancient curse of a plague o' both their houses. *See* William Shakespeare, *Romeo and Juliet,* act 3, sc. 1.[1] Nevertheless, since the parties could not resolve their dispute, we must. The Army and Decker & Co. ("Decker") had a construction contract which the Army eventually terminated for failure to meet the completion date specified in a later modification to the contract. The Armed Services Board of Contract Appeals ("Board") upheld the Army's decision. *Decker & Co. GmbH,* ASBCA No. 41,089, 94–2 B.C.A. ¶ 26,759, 1994 WL 85753 (1994). Decker appeals that decision. Decker also appeals the Board's finding that, despite what appeared to be a final notice of payment, it was not too late for certain deductions to be made by the Army from Decker's final invoice. The Government meanwhile challenges the Board's determination that it can hear an otherwise untimely appeal of the default termination merely because there was a defect in the Contracting Officer's notice of termination, and contends that there must be detrimental reliance by the contractor on the defect.

## BACKGROUND

On November 5, 1986, the Army awarded Decker Contract No. DAJA76–87–C–0094 to renovate a building at McCully Barracks in

John R. Keys, Jr., Winston & Strawn, of Washington, DC, argued for appellant. Of counsel was Robert A. Berger.

1. THE COMPLETE WORKS OF WILLIAM SHAKESPEARE 1027 (Avenel Books ed., Crown Publishers 1975).

Wackernheim, Germany. The original contract called for completion within 150 days (five months) of the notice to proceed. The contract contained the usual plethora of boilerplate clauses as required by the Federal Acquisition Regulations, including clauses dealing with handling of disputes, up to and including termination for default. The contract also contained a liquidated damages clause, triggered by failure to complete the work on time.

There were problems from the start, beginning with the fact that the building was occupied and would be unavailable for work until sometime the following year. This led to the first of four modifications to the contract over the next 18 months; this first modification set the work, and the clock, to begin on April 1, 1987, when the building would no longer be occupied, and provided for an additional 30 days to be added to the work period (now six months). The new completion date was thus September 28, 1987.

On April 1, 1987, the Army told Decker that it would be requiring changes to the scope of work and that a new modification and corresponding work plans would issue to reflect those changes. During the next several months, the parties exchanged letters addressing what work could be done on the project pending Mod # 2's issuance. Decker apparently suspended much of the work pending issuance of Mod # 2, even though the Army urged Decker to continue all work unaffected by the scope of the planned modification.

Mod # 2 issued on September 18, 1987, and included a new completion date of January 21, 1988. A month later the Army wrote to Decker concerning the fact that Decker had not provided a performance schedule or work plan and had not staffed the project sufficiently in light of the hearing completion date and the considerable amount of work remaining on the project. The Army indicated that it would request a "cure notice"

unless Decker provided its performance schedule within four days.[2]

January 21 came and went. On January 25, 1988, the Army issued Mod # 3. This modification extended the completion date to February 10, 1988, in order to allow further time for the development of yet another modification addressing certain changes suggested by Decker. Although the parties had agreed on a price increase to reflect these proposed changes, they had not agreed on a new date for completion of the work. Decker insisted that 120 more days, or two-thirds of the original performance period, were needed, given that it had only completed about 35% of the project. The February 10 deadline passed without completion of the project or issuance of the modification. While negotiations were ongoing, the Army wrote to Decker on February 4, March 9, and May 5 regarding Decker's continued lack of progress and inadequate staffing, urging it to complete as much work as possible pending the modification and specifying work on the exterior of the building and other work that could be completed in the meantime. The May 5 letter stated that the Army would request a cure notice if it did not see more work being done.

Based on estimates from its Engineering Department, the Army determined that 50 days was sufficient to complete the project, including the proposed changes. Decker continued to insist on 120 days. Finally, on May 17, 1988, the Army issued the modification (Mod # 4) as a unilateral Change Order that specified the changes required and a corresponding price increase and set a new performance deadline of July 6, 1988, 50 days hence. This date was now a year and eight months from the date of the original contract of November 5, 1986.

Following issuance of Mod # 4, the Army continued to write to Decker concerning its low staffing and lack of progress on the project, emphasizing that timely completion of the project was critical and seeking Decker's new work performance plan. By the

---

**2.** A "cure notice" identifies a deficiency in the contractor's performance that the Government considers to endanger performance of the contract, and warns the contractor that the contract may be terminated for default if the problem is not "cured" or addressed, within a specified time period. *See* 48 C.F.R. § 49.607(a) (1994).

July 6 deadline, Decker had completed only 50 percent of the project. In a letter dated July 14, 1988, the Army informed Decker that it would collect liquidated damages under the contract for each day the project was not complete.

On August 3, 1988, approximately 21 months from the original issuance of this five month construction contract, the Contracting Officer issued a decision terminating Decker for default, citing Decker's failure to complete the project by July 6, 1988, or to increase manpower on the site despite repeated instructions to do so. The decision was a so-called 'pure' default termination because it did not mention monetary issues, such as liquidated damages, contractor costs to date, or other such items. The decision stated that Decker could appeal to the Board within 90 days, or, alternatively, to the Court of Federal Claims within 12 months. At the time the notice was issued, however, the Court of Federal Claims did not possess jurisdiction over 'pure' default terminations under the Tucker Act, 28 U.S.C. § 1491. *Overall Roofing & Constr., Inc. v. United States,* 929 F.2d 687 (Fed.Cir.1991). Thus the notice incorrectly advised Decker that it could appeal to the Court of Federal Claims within one year.[3]

A few months later, on November 12, 1988, Decker submitted an invoice for the work it had completed on the project. On January 11, 1989, two representatives of Decker met with the Army's Inspector, a Mr. Salsal, and Contracting Officer Representative Wilson, for an on-site inspection to determine the percentage of completion for the items listed in the invoice. Decker revised its final invoice to reflect the percentages agreed during this inspection, and resubmitted the invoice on January 12. On January 31, 1989, a Contracting Officer on the project, Mr. Stephen Kandul, sent a preliminary assessment of liquidated damages to Decker, stating that DM 56.000,00 would be withheld from the final invoice and that "payment of the balance, DM 215,630.66 [sic] will be made."

The letter gave Decker 30 days to submit a written statement of "mitigating circumstances that precluded performance on your part." That same day, Mr. Kandul sent a memo to the Army's Finance Group requesting payment on Decker's invoice, less the liquidated damages. Neither the record nor the briefs indicate that Decker submitted any statement of mitigating circumstances.

Thus ended Decker's efforts at construction, but not Decker's efforts to receive more compensation than the Government was prepared to pay. On February 20, 1989, Decker submitted a certified claim to the Army which included its final invoice in full, along with several other cost claims not presently at issue. A month after Decker was sent the letter advising that it would be paid the DM 215.630,66 Mr. Kandul requested that the Finance Group stop payment on Decker's final invoice, citing "[m]ajor discrepancies . . . discovered in the amount of work actually completed." On April 14, 1989, another CO, Ms. Victoria Busch, wrote to Decker indicating that the stop payment was being lifted, but that in addition to the deduction for liquidated damages as previously stated there would be a further deduction of DM 75.817,27 for "items for which [the Army] did not receive the services and items that were charged at the wrong percentage of completion." Ms. Busch issued a memo that same day to the Finance Group withdrawing the previous stop payment request and authorizing payment of the balance, DM 139.813,39, to Decker.

On May 31, 1989, the Army denied Decker's February 20, 1989 certified claim, except to note that the final invoice would be paid to the extent indicated in its April 14 letter. The letter did not state or otherwise indicate that it was a final decision, however, and the Army did not issue any subsequent final decision on these claims. Subsequently, on June 5, 1990, Decker appealed to the Board the Army's "deemed denial" of its monetary claims, including the April 14 deductions.

---

3. Congress subsequently amended the Tucker Act to provide for jurisdiction in the Court of Federal Claims over nonmonetary contract disputes, such as pure default terminations. *See* Federal Courts Administration Act of 1992, Pub.L. No. 102–572, Title IX, § 907(b)(1), 106 Stat. 3921, 4519, *codified at* 28 U.S.C. § 1491(a)(2)(1994). *See also Sharman Co. v. United States,* 2 F.3d 1564, 1572 (Fed.Cir.1993).

*See* 41 U.S.C. § 605(c)(5) (1988) (failure of contracting officer to render final decision on certified claim within 60 days or such other time as ordered by court, is deemed a denial of claim that authorizes appeal to Board or Court of Federal Claims.) Decker also challenged the propriety of the default termination, asserting that any delays were the fault of the Army.[4] The Army argued that the Board lacked jurisdiction to review the default termination, because Decker had not appealed within the statutory 90–day period; in fact, Decker's appeal was not filed until almost two years after the notice of the termination for default. *See* 41 U.S.C. § 606; *Cosmic Constr. Co. v. United States,* 697 F.2d 1389 (Fed.Cir.1982) (90–day appeal deadline is jurisdictional and cannot be waived).[5]

The Board found that the default termination appeal was not time-barred, and therefore it had jurisdiction over the matter. Citing a prior Board case, *Appeal of Marine Instrument Co.,* ASBCA No. 41,964, 91–3 B.C.A. ¶ 24,289, 1991 WL 179330 (1991), the Board held that because the August 3, 1988 termination notice incorrectly stated that Decker could appeal to the Court of Federal Claims, that notice was "ineffective in terms of triggering a 90–day filing requirement on Decker's part." The Board did not discuss whether Decker had actually relied on the incorrect notice in some way that contributed to the lateness of Decker's appeal.

The Board upheld the default termination on the merits. The Board rejected Decker's claim that the 50–day extension granted by Mod # 4 was an unreasonably short period of time in which to complete the project. The Board found that 50 days was not an arbitrary figure for completion of the Mod # 4 work, given the relatively slight percentage of work encompassed by that Mod vis-a-vis the entire project. The Board concluded that "[i]f Decker [had] prosecuted the work

diligently, it would likely have finished the work by the expiration of the new completion date." With respect to the other remaining work on the project, the Board found that "Decker's default resulted from its own failure adequately to staff the job."

The Board also found that the Army did not err in deducting various amounts from Decker's final invoice, relying on the testimony of two Army witnesses concerning "numerous discrepancies between Decker's invoice and the work actually completed." The Board found that "[b]ased on the inspections of these subordinates, the contracting officer deducted appropriate amounts before authorizing payment to Decker. The Board holds that the Army has met its burden in this regard."[6]

Decker appeals to this court the Board's rulings on the default termination and the deductions. The Government challenges the Board's jurisdiction to review the default termination.

## DISCUSSION

■■■ We review the Board's conclusions of law anew, and may set aside the Board's findings of fact only when they are "fraudulent, arbitrary or capricious, or so grossly erroneous as to necessarily imply bad faith, or if [they] are not support by substantial evidence." 41 U.S.C. § 609(b) (1994); *see Wickham Contracting Co., Inc. v. Fischer,* 12 F.3d 1574, 1577 (Fed.Cir.1994). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wickham,* 12 F.3d at 1577.

### I

The Government argues that the Board erred in not dismissing Decker's appeal of the default termination as untimely. While it

4. Decker also sought remittance of the DM 56.000,00 withheld as liquidated damages. The Board did not address this claim as part of this litigation, and neither do we. A separate appeal by Decker of the liquidated damages assessment is pending before the Board.

5. There was and is no dispute that the Board had jurisdiction over the deemed denial of Decker's

certified claim. *Pathman Constr. Co. v. United States,* 817 F.2d 1573 (Fed.Cir.1987) (deemed denial authorizes appeal but does not trigger limitation period).

6. The Board also upheld the Army's denial of Decker's other cost claims in its February 20, 1989 certified claim; Decker has not appealed these claims to this court.

concedes that the August 3, 1988 termination notice contained incorrect advice regarding appeal to the Court of Federal Claims, the Government asserts that Decker must show detrimental reliance on that error in order to avoid a time bar, citing primarily *Philadelphia Regent Builders, Inc. v. United States,* 634 F.2d 569, 225 Ct.Cl. 234 (1980). Decker responds that the Board consistently has held that final decisions containing incorrect advice regarding appeal rights do not trigger the limitation period, regardless of whether the contractor detrimentally relied on the error.

■ The Government is correct. The Board erred in finding that incorrect advice of appeal rights prevented the limitation period from commencing without requiring a showing of detrimental reliance by Decker. We recognize that numerous Board cases have rejected a reliance requirement. *E.g., SRM Mfg. Co.,* ASBCA No. 44,750, 93–2 B.C.A. ¶ 25,874, 1993 WL 42835 (1993); *Power Ten, Inc.,* ASBCA No. 43,026, 92–1 B.C.A. ¶ 24,400, 1991 WL 187352 (1992); *Leon's Maid and Janitorial Servs.,* ASBCA No. 43,-636, 92–1 B.C.A. ¶ 24,680, 1992 WL 3671 (1992); *TPI Int'l Airways, Inc.,* ASBCA No. 50, 94–2 B.C.A. ¶ 26,746, 1994 WL 73988 (1994); *Short Electronics, Inc.,* ASBCA No. 41,707, 92–1 B.C.A. ¶ 24,465, 1991 WL 186143 (1991) (reconsideration decision); *Electronic Data Sys. Federal Corp.,* ASBCA No. 34,643, 88–3 B.C.A. ¶ 21,178, 1987 WL 41260 (1987); *see also Marine Instr. Co.,* ASBCA No. 41,-964, 91–3 B.C.A. ¶ 24,289, 1991 WL 179330 (1991). *But see Apex Int'l Mgmt. Servs., Inc.,* ASBCA No. 42,747, 91–3 B.C.A. ¶ 24,-226, 1991 WL 170105 (1991) (incorrect advice that contractor could appeal default termination to Court of Federal Claims did not start limitations period because contractor relied to its detriment, citing *W.H. Moseley Co.,* ASBCA No. 27,370–18, 83–1 B.C.A. ¶ 16,272, 1983 WL 7464 (1983)).

This court, however, has never so held. To the contrary, in *Philadelphia Regent Builders, Inc. v. United States,* 634 F.2d 569, 225 Ct.Cl. 234 (1980), our predecessor, the Court of Claims, held that various minor or technical defects in a default termination notice did not invalidate the termination, finding that the contractor had not demonstrated that it had relied to its detriment on those defects. *Id.* 634 F.2d at 572–73. Admittedly, Decker is not seeking here to invalidate the termination itself based on the defect in the default notice; it seeks only to avoid the effect of the termination notice in starting the limitation period running. Nonetheless, *Philadelphia Regent* recognizes the basic principle that harm should accompany a defect in an otherwise proper termination notice in order for the contractor to seek relief based on that defect.

Decker argues that *Philadelphia Regent* is inapplicable because it involved the violation of procurement regulations,[7] and because it was decided under the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1976), whereas this case involves the Army's violation of Section 605(a) of the Contract Disputes Act (CDA), which provides that the CO's final decision "shall inform the contractor of his rights." 41 U.S.C. § 605(a) (1988). The source of the legal requirement placed on the Government is not the issue. The issue is whether any defect in the notice, however immaterial to the contractor's exercise of his rights, is sufficient to deprive the notice of its legal effect. We see nothing in § 605(a), or any other provision of the CDA, that prevents the Board, or the Court of Federal Claims in a "direct action" suit under section 609(a)(1) of the CDA, from requiring contractors seeking to avoid an otherwise proper time bar on the basis of a defect in the notice of appeal rights to demonstrate detrimental reliance on that defect.

■ Section 605(a) requires that the Government provide the contractor sufficient information concerning his rights to make an informed choice as to whether, and in what forum, he will pursue an appeal. The focus of this requirement is the protection of the contractor. When the contractor's determination regarding appeal is unaffected by the defect, the notice does not fail in its protec-

---

7. For example, the notice did not state that the Government reserved all its rights and remedies, and did not have the proper contract number and date. *See Philadelphia Regent,* 634 F.2d at 572.

tive purpose. The notice thus continues to be an effective Contracting Officer's decision under § 605 with respect to triggering the limitation period.

Decker relies on *Pathman Construction Co. v. United States*, 817 F.2d 1573 (Fed.Cir. 1987). In that case, this court held that a "deemed denial" did not trigger the limitation period under the Contract Disputes Act. *Id.* at 1579. In rejecting the government's argument that a deemed denial should be treated as an actual denial "deemed received" by the contractor, the court noted that Congress had established several requirements for final decisions which indicated that actual receipt was important for limitation purposes—e.g., the requirements that they be in writing, be mailed to the contractor, and inform the contractor of his rights under the CDA. *Id.* at 1578. It was in this context that the court noted: "A contracting officer's final decision that does not give the contractor adequate notice of its appeal rights is defective and therefore does not trigger the running of the limitations period," *id.* at 1578.

■ *Pathman* is distinguishable from this case in an important respect. In *Pathman*, since there was no contracting officer's final decision, the contractor was not informed of its appeal rights to even the most limited extent. In this case, it is true that Decker was incorrectly advised that it could appeal to what was then the United States Claims Court. It also is true, however, that Decker was correctly advised of the one appeal right that was available to it at that time—an appeal to the Board within 90 days. Decker thus had critical information that the contractor in *Pathman* did not have. We can detect no reason to automatically permit a contractor in Decker's position an indefinite amount of time, capped only perhaps by laches, in which to challenge a default termination. A contractor in Decker's position must demonstrate that the fact that it was informed of non-existent appeal rights, in addition to being told of its true appeal rights, actually prejudiced its ability to prosecute its timely appeal before the limitation period will be held not to have begun. *Accord The Finney Co. v. United States*, No.

91–1141C, 1991 WL 288910 (Cl.Ct. July 1, 1991), *recon. denied, The Finney Co. v. United States*, No. 91–1141C, 1991 WL 288911 (Cl.Ct. July 19, 1991). The Board thus erred in concluding that the incorrect advice in the August 3, 1988 default termination notice concerning appeal to the Court of Federal Claims in and of itself prevented the limitation period from running, and that Decker's appeal therefore was timely and afforded the Board jurisdiction over Decker's challenge to the default termination.

On appeal, Decker argues that because the Board had held consistently that the type of error found in the August 3, 1988 notice prevented commencement of the limitation period, Decker *could* have waited to file its appeal in reliance on that case law. Decker in its appeal does not assert that it did in fact so rely. Decker's counsel stated at oral argument that he did not know of any record evidence indicating detrimental reliance by Decker on the faulty notice, except insofar as Decker's filing well after the 90–day appeal period suggests such reliance. The Board did not address this or any other issue of reliance. Ordinarily it might be appropriate to remand to the Board for further fact finding. In this case, however, we find that a remand is unnecessary, because even if Decker could demonstrate reliance and therefore the Board was correct in taking jurisdiction, we conclude, as the Board concluded, that Decker would lose on the merits.

II

■ A default termination—a species of forfeiture—is a remedy to which the Government should not lightly resort. *See DeVito v. United States*, 413 F.2d 1147, 1153, 188 Ct.Cl. 979 (1969). We nonetheless find no error in the Board's conclusion that the default termination was proper in this case. "[W]hether the default termination is proper depends upon the facts and circumstances of each case." *Olson Plumbing & Heating Co. v. United States*, 602 F.2d 950, 955, 221 Ct.Cl. 197 (1979). In this case, the Board found that Decker likely could have completed all of the work on the project by July 6, 1988, had it adequately staffed the project between the issuance of Mod # 4 (May 17,

1988) and the July 6 deadline.[8] The record contains substantial evidence to support this finding. Decker failed throughout that period to staff the project adequately despite the Government's repeated instructions to increase manpower and speed up performance. Decker did not keep a supervisor on site at all times, as required, and did not submit a revised performance schedule, despite continuous requests by the Government, until shortly before termination.

Decker's purported problem in scheduling its subcontractors neither excuses its slowness nor renders the July 6 deadline unreasonable. Under the terms of the contract, only those subcontractor problems which are beyond the control of both the subcontractor and the prime contractor may prevent default termination, and the prime contractor must notify the CO within 10 days that such problems are causing delays. The contract clause governing termination for default states:

> [t]he Contractor's right to proceed shall not be terminated nor the Contractor charged with damages ... if—(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor[, including] delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers; *and* (2) The Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay. (emphasis added)

48 C.F.R. § 52.249–10(b). Decker has not persuaded us that any subcontractor problems were beyond its, and the subcontractors', control. The Board found that Decker did not demonstrate that it had tried to replace its subcontractors. Decker does not challenge this finding.[9] Decker's contention that the "slippage of time on the contract prior to the issuance of Modification 4" required Decker to renegotiate subcontractor arrangements at a time when subcontractors were scarce, merely underscores the ill effects of Decker's repeated failure to pursue the work that was not affected by the modification. Decker urges that 120 days, not 50, was required to complete the contract because it was difficult to schedule its subcontractors for the coming summer months; however, Decker had been seeking 120 days rather than 50 from the outset of negotiations over Mod # 4, in February. Moreover, there is no record evidence that Decker brought these problems to the Government's attention during negotiations over Mod # 4 or within a reasonable time after Mod # 4 issued. The earliest record evidence that Decker informed the Army of alleged subcontractor problems is Decker's June 27, 1988 letter to the Contracting Officer's Representative, Mr. Wilson, citing subcontractor scheduling difficulties.

Decker is wrong when it asserts that the Board should not have considered Decker's lack of progress before the issuance of Mod # 4. The Board was entitled to take Decker's performance history into account notwithstanding the fact that the Government set a new completion date for the project, because past lack of progress "indicate[s] a pattern of nonperformance and delay which should not be ignored. Although not justi-

---

8. Decker asserts that the Board only considered whether the July 6 deadline was reasonable for the work required under Mod # 4, and did not consider *all* of the remaining work. However, the Board's Fact Finding # 20 stated that "if Decker had prosecuted the remainder of the work diligently after the modification was issued, it would likely have finished the work by the expiration of the new completion date." Fact Findings 21–23 find that Decker failed to adequately staff the project or to make progress generally after issuance of Mod # 4. Read in light of these findings, the Board's decision clearly considered the new deadline a reasonable period of time in which to perform the remaining work on the project, if Decker pursued that work diligently after issuance of Mod # 4.

9. Decker's cover letter to its revised performance schedule, submitted in late July and well after the performance deadline, notes that it "had to order new subcontractors, since the originally prospected firms were otherwise contractually bound." The letter does not indicate, however, when Decker scheduled new subcontractors or how much of the remaining work the new subcontractors would perform.

fications for default in themselves, they provide a context for understanding and evaluating [Decker's] continued problems. Moreover, the contracting officer could still terminate [Decker] for failure to make progress after [July 6, 1988] relying on the reasons cited above, if those reasons in fact justified termination and continued after the waiver [of the previous completion date]." *Universal Fiberglass Corp. v. United States,* 537 F.2d 393, 397, 210 Ct.Cl. 206 (1976).

Finally, Decker has not persuaded us that the CO acted arbitrarily or capriciously in issuing the termination for default or in conducting the requisite pre-termination inquiry. *See Nuclear Research Corp. v. United States,* 814 F.2d 647, 649–51 (Fed.Cir.1987). We therefore affirm the Board's decision that the termination for default was proper.

## III

Decker argues that the Board erred in upholding the Government's deductions of DM 75.817,27 from the amounts owed for completed work, based on alleged discrepancies in percentage of work completed. These discrepancies apparently were uncovered in an investigation that took place sometime before February 23, 1989, when the CO halted payment on Decker's final invoice, but after the January 31, 1989, letter from the CO to Decker accepting its invoice for work completed less the liquidated damages claim; the record gives no details of this investigation. The Board found:

> At the hearing, the Army presented two witnesses who testified credibly concerning numerous discrepancies based on Decker's invoice and the work actually completed. Based upon the inspections of these subordinates, the contracting officer deducted appropriate amounts *before* authorizing payment to Decker. The Board holds that the Army has met its burden in this regard.

*Decker & Co. GmbH,* ASBCA No. 41,089, 94–2 B.C.A. ¶ 26,759 (1994), at 133, 121, 1994 WL 85753 (emphasis added). Decker contends, however, that the CO already had inspected and accepted the work and authorized payment (subject to reduction for liqui-

dated damages) before it made the deductions, and that such acceptance was final and conclusive under the terms of the contract.

■ Both as a matter of contract and as a principle of law, once the Government accepts the work required under the contract, that acceptance is binding on the parties. *See Sentell Bros., Inc.,* DOTCAB No. 1824, 89–3 BCA 21,904, 1989 WL 65208 (1989); *Ahern Painting Contractors, Inc.,* GSBCA Nos. 7912, 8368, 90–1 BCA 22,291, 1989 WL 112842 (1989). The contract contained an "Inspection of Construction" clause, pursuant to FAR § 52.246–12, that stated in pertinent part:

> (i) Unless otherwise specified in the contract, the Government shall accept, as promptly as practicable after completion and inspection, all work required by the contract or that portion of the work the Contracting Officer determines can be accepted separately. Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee.

48 C.F.R. § 52.246–12(i) (1994). As a matter of general principle, finality in contract relations is important not only in light of the parties' expectations, but as a matter of economic efficiency. Uncertainty has real costs, and it is in the interest of both the contractor and the Government to be able to rely on decisions fairly made.

■ Whether the Government accepted the work and authorized payment on it before deducting amounts from Decker's invoice is a fact question. The record on this issue leaves much to be desired; ultimately, however, we conclude that the Board's finding that the Army made its deductions *before* authorizing final payment is not supported by substantial evidence.

The parties do not dispute that on January 11, 1989, the Contracting Officer's Representative, Mr. Wilson, and the Government's inspector, Mr. Salsal, conducted an inspection of the work. During the inspection they checked the percentage of work completed against the amounts claimed by Decker in its invoice and adjusted those percentages as

necessary. Decker submitted a revised invoice the next day.

The record contains an invoice dated "12.11.89" which Decker cites as the invoice it submitted on January 12, 1989, following the January 11 final inspection of the work site. Although Decker does not explain the discrepancy in date, the Government does not dispute Decker's characterization of this document as the post-inspection invoice, and this characterization is supported by the fact that the invoice is stamped "Received" on January 13, 1989 by the Contracting Officer Representative, Mr. Wilson. The next page in the record is a certification by COR Wilson and Inspector Salsal that "the services called for in this invoice have been rendered in accordance with the terms of the contract and the specification governing same," and a notation for "Partial Payment." It is reasonable to infer, and no one disputes, that the certification accompanied the invoice.

The invoice contains a typed notation by one of the Contracting Officers, Mr. Kandul, subtracting liquidated damages of DM 56.000,00 and setting a new total of DM 215.630,66. Mr. Kandul signed the invoice below the new total. The invoice is also stamped to be sent to the 5th Corps. Finance Group. These notations correlate with a letter sent to Decker by Mr. Kandul on January 31, 1989, which states that liquidated damages of DM 56.000,00 will be withheld and that "[p]ayment of the balance, DM 215,-630.66 [sic] will be made." Mr. Kandul also sent a Memorandum on January 31, 1989 to the 5th Corps. Finance Group which attached Decker's invoice and requested payment of DM 215,630,66.

Taken together, these documents—which the Board does not address at all in its decision—reasonably indicate that Mr. Kandul received the post-inspection invoice after it had been received and certified by Inspector Salsal and COR Wilson, reviewed it, and accepted the invoice subject to the DM 56.000,00 deduction for liquidated damages. Although the certifications are not dated, the Government does not dispute that the certification was in place and that Mr. Kandul reviewed it before signing the invoice and sending it to the Finance Group for payment.

Only later did Mr. Kandul order a stop payment on the final invoice based on discrepancies in the amount of work completed and did Ms. Busch make the disputed deductions.

The Government simply claims, without elaboration, that there is no evidence that anyone of requisite authority accepted the percentages of work completed that were reflected by the final inspection, which the Government later claimed were too high. The Government does not address the "12.11.89" invoice signed by Mr. Kandul. The record supports the contention that in signing this invoice, Mr. Kandul knew of the final inspection and understood that he was accepting post-inspection figures for completed work. As a Contracting Officer, clearly he was authorized to do so. *See* 48 C.F.R. § 52.246–12(i) (1994).

The Government witnesses on whom the Board based its finding testified only that they made mistakes during the final inspection. Ordinary mistakes by the Government's Inspector and COR are insufficient, however, to overcome final acceptance of the invoice by the Contracting Officer. Under the terms of the contract itself, "[a]cceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee." Neither the Board nor the Government has established any such circumstance. The Contracting Officer's acceptance of January 31, 1989 is therefore final and the Board erred in sustaining the Government's deduction of DM 75.817,27 from Decker's final invoice based on the later investigation.

### SUMMARY AND CONCLUSION

To summarize, we find that the Board erred in not requiring Decker to show detrimental reliance on the technical error in the statement of appeal rights contained in the August 3, 1988 default termination notice, before concluding that Decker's appeal of the default termination was timely and within the Board's jurisdiction. We do not remand for further findings on the issue of actual detrimental reliance, however, because we conclude that even if Decker on remand could

establish such reliance, and thus Board jurisdiction over the default termination appeal, the Board did not err in sustaining the default termination. We therefore affirm the Board's decision concerning the default termination on the merits.

 By affirming the Board on the merits, we assume that jurisdiction over the cause was properly in the Board, and hence in this court on appeal. The alternative is to remand to the Board with instructions to conduct a further hearing on the question of detrimental reliance, to determine whether Decker can overcome the untimeliness problem and thus establish jurisdiction over the appeal, and, if so, to reaffirm the decision on the merits against appellant. Although a court must always attend to its jurisdiction, in exceptional situations a court may assume that a party will successfully establish contested jurisdiction, for example if the question is extremely complex and the merits dictate a result contrary to the party alleging jurisdiction. *See, e.g., Browning–Ferris Indus., Inc. v. Muszynski,* 899 F.2d 151, 154–60 (2d Cir.1990), and cases cited therein. By like token, when resolution of the contested jurisdiction will entail expenditure of significant judicial resources to no avail, it is not inappropriate for an appellate court to simply assume that the losing party would succeed in establishing the contested jurisdiction, and to terminate the litigation on the merits.

With respect to Decker's appeal of the Army's deemed denial of its claim for the amounts deducted by the Army from Decker's final invoice, regarding which there is no question that the Board had jurisdiction, we hold that the Board erred in finding that these deductions were made before acceptance of the contract work by the CO. We conclude that the deductions were made after final acceptance by the CO, and that the Army has not proven circumstances sufficient to void that acceptance. We therefore reverse the Board's decision upholding the deductions and remand for entry of judgment in favor of Decker for the amount wrongly withheld plus any interest due.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED*

*COSTS*

Each party to bear its own costs.