# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| ERKA Construction Co., Ltd. | ) ASBCA Nos. 57618, 58515 |
| | ) |
| Under Contract No. W91GF5-07-M-4004 | ) |

APPEARANCE FOR THE APPELLANT:  Paul D. Reinsdorf, Esq.
Frankfurt, Germany

APPEARANCES FOR THE GOVERNMENT:  Raymond M. Saunders, Esq.
Army Chief Trial Attorney
MAJ James P. Leary, JA
LTC Jose A. Cora, JA
Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

These appeals arise out of a contract between the government and ERKA Construction Co., Ltd. (ERKA) in which ERKA operated a "burn pit" at Joint Base Balad in Iraq. The contract provided for the government to furnish ERKA fuel to perform the contract work. The government contends that ERKA stole hundreds of thousands of gallons of fuel, which it then sold outside the base, among other things. Before the Board is a government claim for $482,212.22, which represents the government's calculation of the value of the fuel allegedly stolen. The Board conducted a three-day hearing from 9-11 March 2015 in Falls Church, Virginia. Only entitlement is before the Board.

## FINDINGS OF FACT

*Notable Contract Provisions*

On 19 February 2007, the parties entered into the contract referenced above; it included a base year with a firm-fixed-price of $1,659,600, plus several six-month options (R4, tab 1 at 1-10). Due to these options, ERKA was still performing the contract work in 2009 when the events at issue took place (R4, tabs 3, 8, 11).

Joint Base Balad (the Base) was the largest American base in Iraq. The Base produced an enormous amount of trash per day, including in excess of 120 tons of burnable materials, plus recyclable metals and construction debris. However, it lacked a permanent landfill or a viable method to transport waste off the installation. The contract provided for ERKA to operate a 28-acre burn pit. (R4, tab 1, performance

work statement (PWS) at 1) In the burn pit, ERKA performed screening and inspection, burning, metal removal, concrete crushing, and site remediation operations (*id.* at 24; tr. 1/189). The contract provided for ERKA to transport the ash generated by the burning operations to a certified landfill (R4, tab 1 at 26). Eventually, the government learned that there was no certified landfill[1] in all of Iraq, which resulted in the government requiring an alternate method to dispose of the ash (tr. 1/203-04). Disposition of this ash played some role in the events that followed.

The government provided ERKA with fuel "for official use only in support of this Contract," which prohibited ERKA from transporting "bulk fuel" off the Base. The contract also provided that ERKA's contract price should take into account the fuel provided by the government and that the government would investigate contractors who were suspected of fraud, waste or abuse. (R4, tab 1 at 15, ¶ 13.27)

*The Byles Investigation*

ERKA was not the only contractor entitled to receive fuel without charge to perform its contract work (tr. 1/240). The government provided fuel to these contractors on what might be described as the honor system because there was no oversight to ensure that they took only the amount reasonably required to perform their contract work (tr. 1/49, 2/31). Not surprisingly, allegations arose that contractors were abusing this system.

In 2009, Air Force Special Agent (SA) Matthew Byles was deployed to the International Contract Corruption Task Force. In late July 2009, he arrived at the Base. (Tr. 1/19) One of SA Byle's first actions was to print flyers in several languages that alerted people to a contract fraud tip line (tr. 1/28). Almost immediately, he received a call about theft at the "fuel farm," the area where the government, through another contractor, provided fuel to eligible contractors. SA Byles spoke with the caller at length on 30 July 2009, and then met with him in person on 31 July. (Tr. 1/29)

The informant described a systemic fuel theft problem.[2] The basic scheme, as it related to ERKA, involved a fuel truck obtaining fuel at the bulk fuel farm and driving to the burn pit. Then, it would distribute the fuel to vehicles to which the owners had added additional fuel tanks to carry more fuel, and which could then carry the fuel off

---

[1] The record does not explain what a "certified" landfill is, but an understanding of this is not required to resolve these appeals.

[2] Although SA Byles' hearing testimony appeared to focus on his interactions with one witness, SA Byles appears to have interviewed two witnesses on 31 July 2009 who told him similar stories (supp. R4, tab 38 at 16-17). In any event, our findings are based on what SA Byles saw, not what the informants told him.

the Base. (Tr. 1/32-33) SA Byles was initially skeptical of the informant's allegations due to the volume of the thefts that he alleged — the informant stated that he had a standing offer to buy 7,000 liters of fuel per day (tr. 1/29-30).

SA Byles then began an investigation in which he conducted visual surveillance and took advantage of security cameras around the Base that had zoom and thermal capabilities (tr. 1/33-34). Some components of this system are "aerial"; because they are classified, SA Byles declined to go into specifics beyond stating that they are a "very similar concept" to a blimp (tr. 1/164-65). He conducted surveillance for approximately 30 days (tr. 1/67). In general, he observed dump trucks arriving at the Base gate in the morning where they would be met by an ERKA representative (tr. 1/37). As part of the security screening at the entrance, the trucks would be scanned for organic materials (explosives). Because fuel is an organic material, SA Byles was able to ascertain that the trucks barely had any fuel on them when they entered the Base in the morning (tr. 1/70-71). After passing through security, the trucks would proceed to the burn pit area, which was two to three miles from the gate (tr. 1/41-42).

At the burn pit, the drivers would park their trucks along a fence line and proceed into an ERKA trailer (tr. 1/42). On most days, he observed "a lot of socializing and a lot of parked vehicles" (tr. 1/167). On some days, SA Byles observed the trucks spreading ash around the compound, or he saw a bucket-loader place a scoop of metals in a truck, usually not enough to fill the truck (tr. 1/43-44), but most of the time the trucks were idle (tr. 1/45). SA Byles testified that the trucks left the Base with empty beds about 75 percent of the time (tr. 1/109).

ERKA obtained fuel by sending a tanker truck to the fuel farm. On most days during SA Byles' surveillance, ERKA sent a 3,500 gallon tanker to the fuel farm, which would then return to the burn pit (tr. 1/48-50). One day during the first week of his surveillance, SA Byles noticed more activity than usual. Specifically, he saw interaction between (1) ERKA's foreman (who held a ledger); (2) the man who fueled the trucks; and (3) the Iraqi drivers of the trucks. The man who filled the tanks had a ruler and was using it to measure the added tanks. Then, SA Byles saw the men entering numbers into a calculator or cellular phone. SA Byles interpreted this to mean that ERKA was charging the truck owners based on the amount of fuel they received. (Tr. 1/63-64, 97-98)

SA Byles also observed that on some of the trucks the bed had to be raised because a second tank had been hidden and was not connected to the engine of the truck. Some of these tanks did not have a cap, and the workers would stuff a rag or plastic wrap in the hole. SA Byles observed an ERKA employee driving the tanker truck and distributing the fuel. (Tr. 1/50-51) SA Byles also observed that all of the trucks had added tanks, and that an average of 20 to 30 ERKA trucks came on the base

3

each day (tr. 1/65-67; *see* supp. R4, tab 44, photo 1 (showing added fuel tank on driver's side of truck)). He also observed that ERKA was providing fuel to trucks working for companies other than ERKA (tr. 1/68).

SA Byles followed the trucks as they exited from the Base numerous times. On at least one occasion, he noticed that an added fuel tank was so "overladen" with fuel that it actually left a trail of spilled fuel as it drove off the Base (tr. 1/64-65).

SA Byles did not follow the trucks off the Base, instead relying on the aerial surveillance (tr. 1/161-62). He was able to observe that, after the trucks left the Base, one of the drivers would make a phone call. Then they would proceed to a field within a mile of the Base, where they would be met by a man driving a Mercedes or BMW, usually wearing a white robe. At that point, more phone calls would be placed, then the trucks would move on to another location a quarter of a mile away. (Tr. 1/65-66)

At this next location, more vehicles would arrive carrying men, mobile generators, pumps, and 55-gallon barrels. Using this equipment, they would siphon the fuel from the hidden tanks of the trucks into the 55-gallon barrels. SA Byles observed this on at least 10 occasions. (Tr. 1/66-67)

SA Byles testified that, after making these observations, "we decided the best way to stop it was execute a raid" (tr. 1/72). American and Iraqi forces executed a raid on 5 September 2009, in which they stopped 21 trucks that had received fuel from ERKA at the burn pit. Of the 21 trucks, all but one had a modified fuel tank. Iraqi police detained 32 people but declined to hold non-Iraqi citizens. (Tr. 1/73-74) Although he did not go into detail, SA Byles testified that interviews with the drivers confirmed that the scheme to steal fuel was consistent with his testimony at the hearing (tr. 1/75).

Subsequent to the raid, SA Byles conducted or attempted to conduct interviews with ERKA employees. Notably, on 7 September 2009, when SA Byles attempted to interview ERKA's foreman, Murat Atademir (who, as noted above had been involved in measuring the added tanks), and its project manager, Tayfun Kirac, he discovered that they had fled (tr. 1/92; supp. R4, tab 38 at 54-55, ¶ 2-143).

SA Byles also applied for and obtained search warrants (tr. 1/84). When he executed the search warrant on ERKA, he seized paper records and computers (tr. 1/85). The seizure of the computers, and their condition upon their return to ERKA, is a matter of some controversy that we will address below.

The government has included at least some of the seized evidence in the Rule 4 file at tab 21. These records include invoices to other contractors for "fuel service" (R4, tab 21, attachs. 1, 3). While these invoices do not specifically state that the fuel service

4

came from stolen fuel, they provide at least some support for SA Byles' testimony that he saw ERKA providing fuel to trucks from other contractors. These records also include documents that, while open to interpretation, are consistent with a system for tracking the amount of fuel provided to the subcontractors who owned the dump trucks with the modified tanks (tr. 1/89-97, 3/10; R4, tab 21, attachs. 2, 5).

*ERKA's Fuel Draws*

Although the government did not limit the amount of fuel distributed to eligible contractors, it did keep track of the amount provided to them. The record indicates that until May 2009 ERKA generally received fuel in amounts up to slightly more than 1,300 gallons at one time (R4, tabs 31, 32). On 1 May 2009, ERKA for the first time took a fuel draw of nearly 3,500 gallons (R4, tab 31 at 4-5). The record further indicates that by the second week of May 2009, ERKA was regularly obtaining two fuel draws per day of approximately 3,500 gallons each (*id.*). These records also corroborate SA Byles testimony that ERKA used a 3,500 gallon tanker in August 2009 (*id.* at 8).

ERKA's sole witness, Kamil Kamisli, ERKA's general coordinator and manager (tr. 3/7), denied that the 3,500 gallon tanker was an ERKA truck because in the photographs in the Rule 4 file it did not have an ERKA sticker (tr. 2/82). He indicated that ERKA's largest tanker contained 12,000 liters, which would be about 3,170 gallons, but that it was not working and was used only for storage (tr. 2/51-52, 2/102). He testified that ERKA only used a 1,300 gallon tanker to obtain fuel (tr. 2/102). This testimony is simply wrong based on the records of ERKA fuel draws discussed above. Moreover, the government has submitted photographs showing that "ERKA CO. LTD." had been painted in red on the 3,500 gallon truck in at least two places, which Mr. Kamisli did not comment on. In addition, the government submitted another photograph of a white pickup truck with an ERKA sticker servicing the 3,500 gallon tanker. (R4, tab 39; tr. 1/23-25) Based on the photographs, the testimony of SA Byles, and the fuel records which demonstrate that ERKA obtained fuel in increments of approximately 3,500 gallons on numerous occasions starting on 1 May 2009, we find that ERKA owned or controlled the 3,500 gallon tanker.

*ERKA's Defense*

Although only liability is before the Board, ERKA's defense is mostly aimed at minimizing or eliminating the government's damages claim. With respect to SA Byles' testimony concerning trucks with hidden fuel tanks driving off the Base while spewing out fuel, and then being met by teams to siphon off the fuel into barrels, ERKA brought out only one significant fact during the hearing: most of the video surveillance of the fuel theft was lost after the government's computers became infected with malware (tr. 1/165-66). However, this is not a mortal blow to the

government's case. The Board carefully observed SA Byles during his testimony and found him to be a very credible witness. No innocent explanation has been offered for what he observed. We find that SA Byles testimony was truthful and that he conducted a thorough investigation under the circumstances (*see* R4, tab 38 (Report of Investigation)).

Mr. Kamisli testified that he lived in Baghdad and worked three days in Baghdad and then two at the Base[3] (tr. 2/46, 97) but later contradicted this by testifying that he spent most of his time at the Base (tr. 2/98). As we found above, Mr. Kamisli was unaware that ERKA possessed a 3,500 gallon tanker and believed that ERKA did not obtain fuel from the fuel farm with a tanker larger than 1,300 gallons. He further testified that he never saw any additional tanks on the trucks at issue and that there could not have been any such tanks (tr. 3/36-37, 47). Finally, the contracting officer's representative, Staff Sergeant Sean Hunt testified that, although he went to the burn pit twice per day, he did not recall ever seeing Mr. Kamisli there (tr. 3/50-51). Thus, there is considerable question as to how familiar Mr. Kamisli was with ERKA's work on this contract.

Mr. Kamisli attempted to explain any heightened fuel use based on government direction to perform additional work. Specifically, Mr. Kamisli testified that a large amount of dirt had built up inside the burn pit. He testified that in approximately April 2009 Sgt Hunt directed ERKA to remove it from the Base and approved extra fuel for ERKA to perform the work (tr. 2/55-56). ERKA has produced a number of documents that it contends are receipts for payments to subcontractors to remove dirt from the Base (app. supp. R4, tabs 22-24). The contemporaneous documents appear to indicate that ERKA, or its subcontractors, did take materials off the Base but that it was illegally dumping them (app. supp. R4, tabs 26-27). After the government learned of the illegal dumping in June 2009, Mr. Kamisli testified that ERKA delivered a dumping permit to Sgt Hunt and it resumed taking materials off Base (tr. 2/67-69). However, this is contradicted by an August 2009 document granting access for ERKA's subcontractors to the Base, because the document specifically provides that the trucks must leave the Base empty (app. supp. R4, tab 15).

On cross-examination, Mr. Kamisli at first testified that, other than metals, ERKA did not take any materials off Base prior to 2009 (tr. 2/106). However, at the end of the day, after government counsel had pressed Mr. Kamisli on a number of subjects, Mr. Kamisli changed his testimony, contending that ERKA had been taking "whatever came out of the burn pit" off Base from the start of contract work in 2007 (tr. 2/128). Among other things, this made his earlier testimony that Sgt Hunt was the

---

[3] According to Mr. Kamisli, travel from Baghdad to the Base required three and one-half hours in a convoy (tr. 3/19).

person who caused ERKA to take materials off Base impossible, because Sgt Hunt did not arrive at the Base until March 2009 (tr. 1/179).

Although, as stated above, the contract required ERKA to take ash from the burned trash to a certified landfill, there was nothing in the contract that required ERKA to take dirt off the Base. Mr. Kamisli was aware that this was not part of the contract and testified that it cost $20,000.00-$30,000.00 per month to remove the dirt from the Base (tr. 2/116, 120). Mr. Kamisli's explanation as to why ERKA took dirt off the Base without getting paid is not credible; he testified that ERKA "wanted to do extra work to please" the government (tr. 2/122).

There was some overlap between Mr. Kamisli's testimony and that of Sgt Hunt but where they differ we find Sgt Hunt to be more credible. Sgt Hunt testified that there were mounds on the site and that they were 20-25 percent dirt. But there was also metal, rebar, concrete and recyclables in these piles. (Tr. 1/186, 205, 3/52) Sgt Hunt testified that in the July-August 2009 time frame (or slightly after ERKA was found to have been illegally dumping off Base), the government ordered ERKA to remove the metal to an area on Base referred to as the Defense Reutilization Management Office (DRMO)[4] (tr. 1/190, 197), take the concrete to the concrete crushing area, and remove recyclables and take them to the contractor in charge of those[5] (tr. 1/189, 205). To the extent that there was unburned trash, the government directed ERKA to burn it (tr. 1/205). Although the contract provided for ERKA to remove the ash that resulted from the burning operations to a certified landfill, government engineers tested the ash and determined that it was not hazardous and could remain on Base. Thus, the government directed ERKA to level the ash around the burn pit (tr. 1/203-04, 206). ERKA did this by dumping the ash from a truck and using a small machine and workers to level it. Sgt Hunt testified that ERKA never asked him to modify the contract (tr. 1/218). Sgt Hunt never attended a meeting where he discussed removing materials off the Base (tr. 1/221).

Finally, in September 2009, Mr. Kamisli made a statement to investigators that he had been told two months earlier that the foreman, Murat Atademir, was accepting payments of $5,000.00 contained in cigarette packets in exchange for fuel (app. supp. R4, tab 35). He began an investigation but could not find anyone who would confirm the allegation (*id.*; tr. 2/84). However, he did not check to see if any of the trucks had extra tanks (tr. 3/37-38).

---

[4] To be more precise, the contract only required ERKA to take copper and metals that were U.S. military equipment to the DRMO (R4, tab 1, PWS at 4, tab 3 at 2).

[5] With respect to recyclable materials, it does not appear that the contract specified how those should be processed (R4, tabs 1, 5 at 2).

*ERKA's Computers*

The government seized ERKA's computers on 7 September 2009 and returned them on 24 September (ex. G-1 at 1, ¶ 2). Mr. Kamisli was not at ERKA's office the day SA Byles returned the computers (tr. 1/159). The wholeness of the returned computers is at issue. SA Byles testified that the government imaged the hard drives of the computers and returned the computers to ERKA without ever having removed those hard drives (tr. 1/99-100; ex. G-1 at 1, ¶ 2). By contrast, Mr. Kamisli testified that when ERKA received the computers from the government, the hard drives were missing (tr. 2/89). Mr. Kamisli testified that if the government had returned the hard drives, it (the government) would have "no case" because everything ERKA did (presumably the removal of materials from the Base) was at the direction of the government (tr. 2/90-91).

Assuming for the moment that the returned computers lacked hard drives, this problem perhaps could have been addressed if the government provided copies of the imaged computers to ERKA. Government counsel did just that in November 2014 but a contractor retained by ERKA has submitted a letter contending that it received three hard drives but that the data on them could not be accessed due to intentional physical damage to the hard drives (app. supp. R4, tab 44).

The government sent ERKA's counsel another copy of the data shortly before the hearing in March 2015. The Board left the record open in the event that ERKA discovered additional documents from this production. ERKA then added tabs 45 to 52 to its Rule 4 supplement. While it appears that the government's March 2015 production made more documents available to ERKA, the government was not able to access all of the data that it had imaged in September 2009 due to various technical issues (app. supp. R4, tab 51).

Thus, it is at least theoretically possible that there would have been additional relevant documents if the data had been fully accessible. This brings us back to the question of what happened to the hard drives when SA Byles returned them to ERKA. As we found above, SA Byles was a credible witness who conducted a diligent investigation. We also find that SA Byle's testimony that he returned the computers to ERKA without having ever removed the hard drives was truthful. By contrast, as we discussed above, there were several aspects of Mr. Kamisli's testimony that were contradictory or not credible. With respect to the allegedly missing hard drives, it seems to us that if the computers had been returned without them, ERKA would have promptly protested this to the contracting officer or some other government official, but no such protest has been brought to our attention.

Finally, we note that even if there were additional documents that demonstrated that Sgt Hunt had ordered ERKA to perform additional work and authorized additional

8

fuel as full or partial payment to perform this work, such documents would be of questionable relevance because the contract specifically bars the contracting officer's representative from taking such action. It provides that "the Contracting Officer shall have the right to designate a contracting officers representative (COR).... COR may not approve any work that would add cost to the original contract price or change the terms of the contract." (R4, tab 1, PWS at 7, ¶ 5.0)

*Contracting Officers Final Decisions*

Two contracting officers issued final decisions demanding repayment from ERKA. The first decision, dated 28 February 2011, demanded repayment of $495,360 (R4, tab 30). A second contracting officer conducted a new analysis and on 11 December 2012, issued a decision for a somewhat lower amount, $482,212.22 (R4, tab 48). ERKA appealed both decisions but, as we will explain below, the second decision is the operative decision for present purposes because the government is seeking only the amount demanded in that decision.

## DECISION

*Witness Statements*

The parties have each objected to a witness statement offered by the other party. Under Board Rule 4(d), these documents have been constructively removed from the Rule 4 file and we have permitted the parties to offer the documents into evidence under Rules 10 and 13. The Federal Rules of Evidence are not binding on the Board but may be used to guide the Board's rulings. Board Rule 10(c).

The government has submitted a four-page, single-spaced, statement from Orhan Canatar (supp. R4, tab 45). Mr. Canatar did not testify at the hearing, nor did the investigators who took this unsworn statement. Based on this statement, it appears that Mr. Canatar was the project manager for ERKA on this project from about February 2008 until March 2009. While this statement has some interesting details or allegations about the background of ERKA's theft, in general, it is rambling and difficult to understand and suffers from what appears to be an awkward translation from Turkish. Beyond these concerns, there are several additional factors that prevent us from relying on it. First, Mr. Canatar admits that he is involved in an unidentified dispute with ERKA in the Turkish legal system that may be criminal in nature (*id.* at 4). Second, there appears to have been a dispute between ERKA and Mr. Canatar about work he performed for ERKA for which he contends he was not paid (*id.* at 1). Third, Mr. Canatar makes allegations in the statement without adequately explaining them, such as "Erdal [Kamisli, ERKA's owner] knew what was going on" (*id.* at 3). Fourth, the statement largely appears to deal with the time period up to March 2009 (*see id.*), which is prior to the time period of theft involved in this appeal. Under these circumstances,

9

live testimony from Mr. Canatar so that we could assess his credibility, particularly on cross examination by ERKA's attorney, was indispensable. This statement does not aid the Board in resolving this matter and we see no reason to admit it.

ERKA has submitted a declaration by Tayfun Kirac, ERKA's project manager who, as noted above, fled shortly after the raid and before SA Byles could interview him (tr. 1/132). In this declaration, Mr. Kirac does not address his abrupt departure in the declaration but his testimony is consistent with Mr. Kamisli's testimony that Sgt Hunt directed ERKA to take the dirt mounds off the Base and authorized fuel to be issued to the subcontractors. (App. supp. R4, tab 45, ¶¶ 6-10)

The Kirac declaration is an out of hearing statement offered to prove the truth of the matters asserted and is, therefore, hearsay but ERKA has not identified any exception to the hearsay rule that would allow us to consider it. While that is not dispositive of this issue given our discretion under Board Rule 10(c), we will not exercise our discretion to admit this document. In addition to Mr. Kirac's sudden departure from the Base, there are several documents in the record that either tie Mr. Kirac to the fuel theft or at least indicate that he was aware of it (supp. R4, tab 38 at 19, tab 36 at 23-24, 30). Under these circumstances, it would not be in the interest of justice to admit this self-serving declaration while denying the government the opportunity to cross-examine Mr. Kirac.

## ASBCA No. 57618

On 28 February 2011, a contracting officer issued a final decision demanding repayment of $495,360 (R4, tab 30). ERKA filed a notice of appeal of that decision on 13 May 2011 and the parties litigated that decision for more than 18 months.

On 11 December 2012, a different contracting officer issued a new final decision (R4, tab 48). In that decision, the contracting officer stated that she had conducted a new analysis of fuel receipts and electronic fuel draw records and had calculated a new loss amount of $482,212.22. The contracting officer found that ERKA stole a total of 321,317 gallons of fuel during the period from 1 May 2009 until 6 September 2009. ERKA filed a notice of appeal of that decision on 25 January 2013, which the Board docketed as ASBCA No. 58515. The Board consolidated the two appeals.

The government is seeking only the $482,212.22 from the second contracting officer's final decision (*see* gov't post-hearing brief). Thus, the second contracting officer's final decision and the second appeal effectively superseded the earlier decision and appeal (*see* tr. 3/66 where both parties agreed that the earlier appeal had been superseded). Thus, ASBCA No. 57618 is dismissed as moot.

10

We start by considering what the government has, and has not, proven. First, we conclude that the government has not proven whether this fuel theft scheme was an enterprise that benefited ERKA, or simply the people who were involved. In other words, the government has not proven what happened to the payments received for the fuel that was siphoned out of the trucks outside of the gate. There is simply no conclusive evidence on this issue. At least one piece of evidence, Mr. Kamisli's statement to SA Byles that he had heard two months earlier that Murat Atademir was taking $5,000 payments in cigarette packs, might suggest that this was a personal, rather than corporate, enterprise. The government has not proven that ERKA's ownership or upper management knew about the scheme.

On the other hand, we have little difficulty in determining that ERKA's project level management staff had knowledge of the theft. First, project level management would have known that 20-30 trucks with added fuel tanks came into the burn pit each day and performed little work but received fuel, in many cases by raising the bed of the trucks; they then exited the Base loaded with this fuel, contrary to the contract provision barring the removal of fuel from the Base, and in some cases spilling out the fuel as they drove. They also would have known that ERKA's fuel consumption increased in May 2009 with no record of any action by the contracting officer to increase the contract work. We also believe that they would not have tolerated these actions unless they, or ERKA, were benefitting from them.

Second, ERKA has not made any attempt to explain the sudden departure of its foreman and project manager from the Base after the raid. It is well settled that flight is probative evidence of guilt. *DeWitt v. Dep't of Navy*, 747 F.2d 1442, 1444 (Fed. Cir. 1984).

Third, SA Byles testified that he saw the foreman, Murat Atademir, inspecting and measuring the added fuel tanks on the trucks before they were fueled up. Thus, there is direct evidence of knowledge or involvement in the scheme on the part of at least the foreman.

In summary, any contention that ERKA's project management did not know about the theft is simply not credible based on the facts presented to us. We now turn to the issue of ERKA's liability for these actions.

A government contractor must adequately staff a project and supervise its employees. *Decker & Co. v. West*, 76 F.3d 1573, 1580-81 (Fed. Cir. 1996). In this case, the contract warned ERKA that the government would investigate contractors suspected of fraud, waste, or abuse of fuel supplies, but even without such a warning, a reasonable contractor would have known that it could not swipe as much fuel as its

11

modified fuel tanks hold. While we have found that there is little evidence tying ERKA's ownership/upper management to the theft, they were responsible for selecting responsible project management personnel who would ensure that ERKA met the terms of its bargain with the government. Unfortunately for all concerned, the staff they selected were the functional equivalent of leaving the fox in charge of the hen house. ERKA breached the contract by allowing its employees or subcontractors to steal fuel.

ERKA contends, however, that it should not be held responsible for the acts of employees who were acting only to further their own interests. It relies on a case from the District of Columbia Court of Appeals, *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415 (D.C. 2006). In *Schecter*, a homeowner sued a delivery company in tort after the company's driver stole jewelry during the delivery of a washing machine. Relying on the RESTATEMENT (SECOND) OF AGENCY § 228 (1958), the court held that the employer could not be held liable under the doctrine of *respondeat superior* because the theft was independent of the employer's business and solely for his own benefit. *Id.* at 428. The court relied upon § 228(2) of the RESTATEMENT, which provides that conduct of a servant is not within the scope of employment "if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.* It further relied on RESTATEMENT § 235, which provides that a servant's act is not within the scope of employment "if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." *Id.* The court of appeals concluded that the driver's authorized actions involving delivery of the washing machine had "no rational relationship" to the jewelry theft and affirmed the trial judge's directed verdict in favor of the employer on this issue. *Id.* at 428-31. However, it reversed the trial judge's directed verdict in favor of the employer on the issue of negligent hiring, training, and supervision of the driver, and held that this issue should have been submitted to the jury. *Id.* at 432.

While there was "no rational relationship" between the delivery and the theft in *Schecter*, in this case there is at least some relationship between the two actions because ERKA's employees were authorized to take fuel, they just took too much. Thus, if we look to § 235 of the RESTATEMENT as the court of appeals did in *Schecter*, the actions at issue were performed with the intention to perform them "as a part of or incident to a service on account of which he is employed." *Schecter*, 892 A.2d at 428.

This approach is consistent with the rationale of the Court of Appeals for the Federal Circuit in *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348 (Fed. Cir. 2013). In *Kellogg Brown & Root (KBR)*, the government awarded KBR a cost-reimbursement contract that, among other things required reimbursement of payments to subcontractors. KBR awarded a subcontract to a company that had paid kickbacks to a KBR regional food service manager and his deputy. Simplifying somewhat, the

12

subcontractor billed KBR amounts that were passed on to the government; during performance of the work, KBR recognized that some of the subcontractor's prices were not reasonable. Ultimately, the government withheld $41 million in payments and KBR filed suit in the Court of Federal Claims. *KBR*, 728 F.3d at 1353-57. The government filed a counterclaim under the Anti-Kickback Act (AKA), 41 U.S.C. §§ 8701-07.

In determining the extent of KBR's liability under the AKA, the Federal Circuit analyzed whether KBR could be held liable under the section of the AKA that prescribes penalties for knowingly engaging in conduct prohibited by the Act. *KBR*, 728 F.3d at 1368. The court of appeals concluded that this was an appropriate case for finding vicarious liability. The court reasoned that because corporations act through their employees "the general rule is that an agent's knowledge is imputed to the principal when employees are acting with the scope of their authority or employment, absent special circumstances." *Id.* at 1369. The court explained that the "adverse interest" exception to this doctrine is a narrow one. *Id.* The conduct must be entirely in the agent's own interest without even incidental benefit to the principal. Thus, although only the employees benefitted from the kickbacks, and KBR apparently overpaid for the subcontract work by millions of dollars, the Federal Circuit held that KBR received at least some benefit because the subcontractor did provide necessary services to KBR. *Id.* at 1370.

Applying this logic to the present case, even if the sale of the stolen fuel benefitted only the employees involved, ERKA can still be held liable. The theft of the fuel occurred during the performance of a key contract task: obtaining fuel to perform that work. ERKA used some of the fuel to perform the contract work and sold the remainder. Because fuel was part of the contractor's compensation under the contract, the government essentially paid ERKA an unreasonable amount for the services performed, just as the government did for the subcontractor's work in *KBR*. Thus, the corruption is inextricably intertwined with the performance of the actual contract work, just as it was in *KBR*.

Our holding is also consistent with the decision of the Court of Appeals for the Tenth Circuit in *Richards v. Attorneys' Title Guaranty Fund, Inc.*, 866 F.2d 1570 (10th Cir. 1989), which is not binding on us but contains a highly persuasive analysis of the Restatement in a case involving comparable facts. *Richards* involved the sale of "7-Eleven" stores, in which the defendant-title insurer agreed to perform the closing and retained an agent to conduct it. Before the proceeds of the sale were paid to the seller, the president of the closing firm converted the funds to cash and left the state. *Id.* at 1571. The seller filed suit against the title insurer. After a jury returned a verdict in favor of the plaintiff-seller, the title insurer appealed.

On appeal, the insurer challenged, among other things, a jury instruction that the district court gave based on RESTATEMENT (SECOND) OF AGENCY § 261. This section provides: "A principal who puts a servant or other agent in a position which

13

enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." The Tenth Circuit explained that the RESTATEMENT provides that when one of two innocent persons must suffer from the acts of a third person, the one who must bear the consequences is the one who put the wrongdoer in power to inflict the injury. *Richards*, 866 F.2d at 1572-73. The Tenth Circuit held that the RESTATEMENT was consistent with Colorado Law (the state where the events took place) and upheld the decision in favor of the plaintiff seller.

In this case, taking into account our conclusion that it was not proven that ERKA's ownership or upper management was involved in the theft, we are forced to make a similar decision as the Tenth Circuit in *Richards*, namely, should the loss fall on the government, or upon ERKA which put in place people who were dishonest, and whose general manager failed to stop the theft even after it was brought to his attention. Our conclusion is that under *Richards* and the Federal Circuit's decision in *KBR*, responsibility should fall upon ERKA.

Accordingly, this appeal is remanded to the parties for resolution of quantum consistent with this opinion.[6]

Dated: 9 March 2016

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[6] Our jurisdiction under the Contract Disputes Act is to determine the contractual dispute presented by the facts we have found. We cannot, and do not, determine criminal liability by this opinion. We do determine the respective contractual rights of the parties and as is evident, have determined that ERKA violated contract provisions related to the government's provision of fuel to be used to perform the contract and must respond in damages.

14

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57618, 58515, Appeals of ERKA Construction Co., Ltd., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

15